817 So.2d 786 (2002)
James Eugene HUNTER, Appellant,
v.
STATE of Florida, Appellee.
James Eugene Hunter, Petitioner,
v.
Michael W. Moore, Secretary, Florida Department of Corrections, Respondent.
Nos. SC00-1885, SC01-836.
Supreme Court of Florida.
April 4, 2002.
Rehearing Denied May 16, 2002.
*788 Eric C. Pinkard, Assistant CCRC-Middle, Capital Collateral Regional Counsel-Middle, *789 Tampa, FL, for Appellant/Petitioner.
Robert A. Butterworth, Attorney General, and Kenneth S. Nunnelley, Assistant Attorney General, Daytona Beach, FL, for Appellee/Respondent.
PER CURIAM.
James Eugene Hunter, a prisoner under sentence of death, appeals the trial court's denial of his motion for postconviction relief, and he petitions this Court for a writ of habeas corpus. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const. For the reasons stated below, we affirm the trial court's order denying postconviction relief and deny Hunter's petition for writ of habeas corpus.

BACKGROUND
Hunter was convicted of one count of first-degree murder, three counts of attempted first-degree murder, three counts of armed robbery, and one count of attempted armed robbery. This Court has previously summarized the facts:
On September 16, 1992, James Hunter (a.k.a. Michael Miller), Tammie Cowan, Cathy Woodward, Charles Anderson, Andre Smith, and Eric Boyd traveled by car from St. Augustine to DeLand. Tammie testified that there were two black BB guns and one silver handgun in the car. Boyd and Anderson had the BB guns and Hunter had the handgun. In DeLand they stopped briefly to see Andre Smith's mother. Thereafter, at approximately 11:44 p.m., Cowan stopped the car and Anderson, Boyd, Smith, and Hunter exited. Hunter then confronted and robbed a man on the street, using the silver handgun. Hunter and his companions then departed for Daytona Beach. Shortly afterwards, a "be on the lookout" (BOLO) alert for the DeLand robbers was transmitted by the police throughout the Volusia County area. The BOLO described a gray four-door sedan occupied by at least five black individuals, two of whom were females, who were suspects.
After the robbery, Hunter directed Cowan to drive to Daytona Beach and the vicinity of Bethune-Cookman College where four young men were standing outside the "Munch Shop." Hunter instructed Cowan to stop the vehicle, and Hunter, Lewis, Anderson, and Smith exited and approached the four men. Hunter was armed with the silver handgun.
Hunter approached the men and ordered them to "give it up." Hunter and his companions then robbed the men at gunpoint. Thereafter, while the men were lying face down on the sidewalk, Hunter shot each of them in turn. Wayne Simpson was the last victim to be shot in this process, and he subsequently died. Hunter and his colleagues then fled with the victims' clothing, jewelry, and other miscellaneous items of personal property. When Hunter returned to the car, he ordered Cowan to leave, and told her that he had fired the gun because a victim had tried to run. Shortly thereafter, at 12:40 a.m., Deputy Richard Graves observed a vehicle in Ormond Beach matching the DeLand BOLO. Graves stopped the automobile, and Cowan told Graves that she and the others had come from DeLand. While the car was stopped, the DeLand robbery victim was brought to the scene where he identified Hunter as his robber and also identified the car. Cowan consented to a search of the car which yielded two BB guns and personal property belonging to the victims of both the DeLand and Daytona Beach robberies. The gun used by Hunter was never found.
*790 See Hunter v. State, 660 So.2d 244, 246-47 (Fla.1995). A jury found Hunter guilty of all eight charges and recommended that Hunter receive the death penalty for Simpson's murder by a vote of nine to three. See id. at 247. The trial court followed the jury's recommendation and sentenced Hunter to death.[1] We affirmed Hunter's convictions and sentences on direct appeal. See id. at 246. The United States Supreme Court subsequently denied Hunter's petition for writ of certiorari. See Hunter v. Florida, 516 U.S. 1128, 116 S.Ct. 946, 133 L.Ed.2d 871 (1996).
Hunter filed an initial postconviction motion in March of 1997. On February 24, 1999, Hunter filed a first amended 3.850 motion raising seven claims. The trial court held a preliminary Huff[2] hearing on April 5, 1999. Subsequently, Hunter filed a second amended 3.850 motion raising thirteen claims, with multiple subparts.[3] On January 25, 2000, the trial court entered an order granting an evidentiary hearing on claims (1), (6), (12), and part of (13),[4] and summarily denying Hunter's remaining *791 claims. The trial court held an evidentiary hearing on April 5, 2000. Thereafter, the trial court entered an order denying all relief.

POSTCONVICTION APPEAL
Hunter raises nine issues on appeal,[5] seven of which may be disposed of summarily because we conclude they are procedurally barred or without merit.[6] Hunter's remaining two claims, however, warrant discussion and we will address them in turn.

Conflict of Interest
First, Hunter alleges that trial counsel was ineffective due to an actual conflict of interest. Specifically, Hunter argues that an actual conflict of interest existed because Taurus Cooley, a State witness and one of the surviving victims, was formerly represented in several unrelated cases by the same public defender's office that represented Hunter. Hunter contends that the conflict of interest prevented adequate cross-examination and impeachment of Cooley regarding recent and pending criminal charges. The trial court conducted an evidentiary hearing on this claim, and subsequently denied the claim.
Initially, we acknowledge that the right to effective assistance of counsel encompasses the right to representation free from actual conflict. See Strickland, 466 U.S. at 688, 104 S.Ct. 2052; Cuyler v. Sullivan, 446 U.S. 335, 349, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). However, in order to establish an ineffectiveness claim premised on an alleged conflict of interest the defendant must "establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler, 446 U.S. *792 at 350, 100 S.Ct. 1708; see also Quince v. State, 732 So.2d 1059, 1065 (Fla.1999). A lawyer suffers from an actual conflict of interest when he or she "actively represent[s] conflicting interests." Cuyler, 446 U.S. at 350. To demonstrate an actual conflict, the defendant must identify specific evidence in the record that suggests that his or her interests were compromised. See Herring v. State, 730 So.2d 1264, 1267 (Fla.1998). A possible, speculative or merely hypothetical conflict is "insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350, 100 S.Ct. 1708. "[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." Id. If a defendant successfully demonstrates the existence of an actual conflict, the defendant must also show that this conflict had an adverse effect upon his lawyer's representation. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 350, 100 S.Ct. 1708.
The question of whether a defendant's counsel labored under an actual conflict of interest that adversely affected counsel's performance is a mixed question of law and fact. See Cuyler, 446 U.S. at 342, 100 S.Ct. 1708; Quince, 732 So.2d at 1064. Once a defendant satisfies both prongs of the Cuyler test, prejudice is presumed and the defendant is entitled to relief. See Strickland, 466 U.S. at 692, 104 S.Ct. 2052; Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708.
In McCrae v. State, 510 So.2d 874 (Fla. 1987), this Court addressed a similar claim in which the appellant contended trial counsel had an actual conflict of interest. In particular, McCrae asserted that a State's witness was represented in an unrelated criminal prosecution by an attorney employed in the same public defender's office as McCrae's trial counsel. In rejecting this claim, we explained:
At the hearing below, the attorney who represented appellant at trial testified that he did not know that the witness was being represented by another attorney in the same public defender's office. The other attorney, who represented the witness, testified that he did not discuss the defense of appellant with appellant's trial counsel. Because appellant's counsel was not aware of the situation, he cannot be charged with any deficiency for not taking some kind of action concerning the matter. Nor do we think that the situation called for counsel to make inquiry into the matter in order to be considered reasonably effective and within the range of normal, professional competence. We need not reach the question of whether there was an "actual" or "meaningful" conflict of interest that affected or must be presumed to have affected the outcome. See Porter v. State, 478 So.2d 33, 35 (Fla.1985); Foster v. State, 387 So.2d 344, 345 (Fla.1980). [n. 1] We simply hold that no deficiency of performance by defense counsel is shown on this point.
N 1. As was stated in Porter v. Wainwright, 805 F.2d 930 (11th Cir. 1986), an "actual" conflict of interest exists if counsel's course of action is affected by the conflicting representation, i.e., where there is divided loyalty with the result that a course of action beneficial to one client would be damaging to the interests of the other client. An actual conflict forces counsel to choose between alternative courses of action. Stevenson v. Newsome, 774 F.2d 1558, 1562 (11th Cir. 1985), cert. denied, 475 U.S. 1089, 106 S.Ct. 1476, 89 L.Ed.2d 731 (1986); Baty v. Balkcom, 661 F.2d 391, 395 (5th Cir.1981) (Unit B), cert. denied, 456 U.S. 1011, 102 S.Ct. 2307, 73 *793 L.Ed.2d 1308 (1982). To show actual conflict, one must show that a lawyer not laboring under the claimed conflict could have employed a different defense strategy and thereby benefitted the defense. United States v. Mers, 701 F.2d 1321, 1328-30 (11th Cir.), cert. denied, 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983). Only when such an actual conflict is shown to have affected the defense is there shown prejudicial denial of the right to counsel. Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Appellant's counsel at trial was not even aware that the state's witness was represented by the same public defender's office, so there could not have been an actual conflict.
Id. at 877 (emphasis added).
Although this Court stated in McCrae that it need not decide whether there was a conflict, we nevertheless noted that there was no actual conflict of interest violation since counsel was unaware of the public defender's representation of the State's witness. See id. We find McCrae equally applicable to the instant case. As in McCrae, trial counsel in this case testified at the postconviction evidentiary hearing that he was completely unaware of the public defender office's previous representation of Cooley. In fact, trial counsel, when asked by collateral counsel about Cooley's criminal background during the postconviction hearing, indicated that he did not know of Cooley's criminal charges. Hence, the trial court was entitled to conclude that since trial counsel was not even aware of the public defender's prior representation of Cooley, such prior representation could not have affected his representation of Hunter. Thus, while Hunter has articulated a potential conflict of interest, see, e.g., Porter v. Singletary, 14 F.3d 554, 561 (11th Cir.1994), we hold that the trial court did not err in concluding that he has failed to demonstrate that an actual conflict of interest existed that affected his lawyer's performance under the circumstances in this case.
Moreover, even if an actual conflict of interest existed within the public defender's office, we conclude that Hunter has failed to demonstrate that such conflict adversely affected his counsel's representation. See Herring, 730 So.2d at 1268 ("Although a court's inquiry into `actual conflict' and `adverse effect' may overlap, the Cuyler decision is clear on its face that the defendant must satisfy both prongs of the claim to prove ineffective assistance of counsel."). Although Hunter contends the conflict prevented adequate cross-examination of Cooley regarding his recent and pending criminal charges in an attempt to impeach his credibility, this contention is refuted by trial counsel's testimony that he was not even aware of Cooley's criminal background or the public defender's prior representation of Cooley.
Accordingly, based on the record in this case, Hunter has failed to establish any factual correlation between trial counsel's alleged failure to impeach Cooley on cross-examination and the public defender's office's prior representation of Cooley. Consequently, we conclude that the trial court did not err in rejecting Hunter's conflict of interest claim.

Ineffective Assistance of Counsel
Next, Hunter alleges that trial counsel was ineffective for failing to challenge the State's case through the use of photographic evidence. Hunter argues that trial counsel failed to utilize certain color photographs taken by law enforcement officers on the night of the offense, which depicted the clothing the suspects were wearing. Specifically, Hunter argues that (1) trial counsel failed to use the photographs to file pretrial motions challenging *794 the identification of Hunter, and (2) trial counsel failed to use the photographs in Hunter's defense at trial. Hunter maintains that the photographs, which show him wearing a white T-shirt and codefendant Eric Boyd wearing a red shirt, are crucial since eyewitnesses indicated that the actual shooter was wearing red clothing.[7]
The photographs in question were taken by Investigator McLean at the DeLand Police Department on the night of the offense. McLean took the photographs as part of the investigation concerning the earlier robbery that took place in DeLand before Hunter and his codefendants traveled to Daytona Beach. McLean subsequently gave the photographs to Detective Flynt of the Daytona Beach Police Department, who used the photographs to make show-up folders for identification purposes. The show-up folders, however, were apparently never shown to the three surviving victims of the Daytona Beach criminal episode. On direct appeal, we affirmed the trial court's finding that the show-up photographs were disclosed to trial counsel at a deposition where such photographs were presented and counsel not only had an opportunity to examine the photographs, but also received a photocopy of the photographs. See Hunter, 660 So.2d at 250-51.
In order to prove an ineffective assistance of counsel claim, a defendant must establish two elements:
First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.
Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Rutherford v. State, 727 So.2d 216, 219-20 (Fla.1998); Rose v. State, 675 So.2d 567, 569 (Fla.1996). To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. 2052. Ineffective assistance of counsel claims present a mixed question of law and fact subject to plenary review based on the Strickland test. See Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999) (citing Rose v. State, 675 So.2d 567, 571 (Fla.1996)). This requires an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings. See id.
In its initial order on postconviction relief, the trial court summarily rejected Hunter's claim that trial counsel was ineffective for failing to file pretrial motions *795 challenging the identity of Hunter as legally insufficient. In its subsequent order denying postconviction relief after an evidentiary hearing, the court found there was not a reasonable probability that the use of the photographs in question would have shown substantial inconsistencies between the in-court identifications and photo identifications by State witnesses Cooley and Howard.
Hunter alleged in his amended 3.850 motion that State witnesses Cooley and Howard, upon viewing the color photographs, identified codefendant Boyd as the shooter. However, Cooley's testimony at the postconviction evidentiary hearing did not support Hunter's identification allegation,[8] and Howard did not testify at the evidentiary hearing. Hence, because the trial court's findings that Hunter did not prove prejudice are supported by the record, we find no error in the trial court's conclusion that Hunter has failed to demonstrate prejudice as a result of trial counsel's failure to file pretrial motions challenging the identity of Hunter. Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
On appeal, Hunter also points to Detective Flynt's testimony at the evidentiary hearing that he did not show the show-up folders to the surviving victims because they were unsure that they could identify anyone. Cooley, however, testified at the evidentiary hearing that he did not recall telling Detective Flynt that he was unsure if he could identify Hunter. Moreover, trial counsel during closing argument at the guilt phase argued, "[The State] presented no evidence that any of those three victims were submitted to a photo lineup or a physical lineup. Why was that? Because when Detective Flynt talked to them that night, they could not identify them. That's why they didn't even bother doing it." Thus, the record demonstrates that this issue was presented to the jury by counsel.
The trial court also rejected Hunter's claims alleging that trial counsel was ineffective for failing to use the photographs during trial to challenge the State's case. The trial court rejected this claim and concluded:
This Court finds that there is not a reasonable probability that the use of these photos by counsel would have changed the outcome of the trial. In Defendant's 3.850 motion, he alleged that Taurus Cooley, one of the witnesses who identified him at trial as the shooter, had recanted that identification and would testify the co-defendant Boyd was the shooter. Cooley testified at the evidentiary hearing on Defendant's 3.850 motion that he did not make an identification of Boyd as the shooter from the lineup photos when shown to him by a CCRC representative. Further, at trial the uncontroverted evidence was that the shooter was wearing a red shirt and while, at the time of the arrest minutes after the shooting, Defendant was wearing a white shirt. Defense counsel argued these facts extensively during closing argument, including the fact that Deputy Graves' field interview cards also showed the Defendant wearing a white shirt at the time of arrest. Thus, the use of these color photos would have been cumulative evidence not reasonably likely to produce a different outcome.
Defendant further claims that although the evidence showed that he was wearing a white shirt at the time of arrest, the information that co-defendant Boyd was wearing a red shirt at the *796 time of arrest was never given to the jury. This is rebutted by the record. Co-defendant Pope testified at trial that Defendant was wearing a white shirt, and also stated that one of his co-defendants, which included Boyd, was wearing a red shirt. In addition, this Court finds that this argument merely restated the argument that these photos would have presented a better identity issue to the jury. As demonstrated by defense counsel's closing argument, the jury was presented with this exact issue, i.e., that Defendant was wearing a white shirt while the shooter was wearing a red shirt. Thus, this claim is legally insufficient as Defendant has not shown any actual prejudice.
As noted by the trial court in rejecting Hunter's claim, the record affirmatively reflects that trial counsel pointed to the evidence, such as Detective Graves' field interview cards, and argued extensively to the jury during closing argument at the guilt phase that Hunter was wearing a white shirt when arrested shortly after the robbery and shooting. Indeed, a review of trial counsel's closing argument reveals at least eleven references to the evidence that Hunter was wearing a white shirt while witnesses testified that the shooter was wearing red clothing, i.e., a red shirt or red hat. Trial counsel also argued in closing that the State presented no evidence that the surviving victims identified Hunter in a physical or photographic lineup. Thus, identity was a major focus of defense counsel's presentation of the defense case and the issue was squarely placed before the jury.
Although we agree that the use of the photographs in question might have aided in the defense presentation of the identity issue, we find the trial court was entitled to conclude that such evidence would have been cumulative in light of the similar evidence that was presented and defense counsel's extensive treatment of this issue to the jury. Further, Hunter's argument as to prejudice based upon trial counsel's failure to use the photographs overlooks the extensive trial testimony and evidence establishing Hunter's guilt.[9] Accordingly, based upon all these circumstances, we find no error in the trial court's conclusion that Hunter has failed to demonstrate error in the trial court's conclusion that prejudice was not established as required under Strickland.
Hunter also claims that trial counsel's failure to use the photographs at trial prejudiced him during the penalty phase because there is a reasonable probability that he would have received a life sentence had the photographs been introduced. As noted by the State, Hunter did not allege that he was prejudiced in the penalty phase in his amended 3.850 motion, nor did Hunter make this argument during the postconviction evidentiary hearing. Thus, this argument does not appear to be properly before this Court.[10]See Shere v. State, 742 *797 So.2d 215, 218 n. 7 (Fla.1999); Doyle v. State, 526 So.2d 909, 911 (Fla.1988). Nonetheless, even if this issue were not waived, we conclude Hunter's argument would be without merit for the same reasons extensively discussed above.
Hunter primarily relies on this Court's recent decision in Ray v. State, 755 So.2d 604 (Fla.2000), to support his claim that he was prejudiced in the penalty phase. In Ray, this Court found the appellant's death sentence disproportionate where the record in the case revealed the possibility that the codefendant (Hall) was the shooter. See id. at 611-12.[11] Analogously, Hunter contends that there is a reasonable probability that he would have received a life sentence if trial counsel had used the photograph of codefendant Boyd wearing a red shirt since it would have raised the "possibility" that Boyd was the actual shooter. In contrast to the present case, however, in Ray the evidence indicated that at a minimum, the two defendants were equally culpable. For instance, Hall's wounds suggested that he was facing the victim with his arms raised in a shooting position; Hall's blood was on the murder weapon; evidence pointed to Hall as the dominant player in the crime who did nearly all of the talking during the robbery; and Hall's statements and questions to paramedics suggested he was responsible for the shooting. See id. Moreover, the trial judge's remarks in sentencing Hall reflected that he believed Ray and Hall were at least equally culpable in the shooting. See id. at 612.
By contrast, no evidence in the record, other than Hunter's current argument premised on the photographs, suggests that Hunter, who was identified as the main actor and shooter, and codefendant Boyd were equally culpable. Based upon the entire record in this case we conclude that Hunter's presentation below has not substantially undermined confidence in the outcome of the proceedings, or that "but for counsel's errors he would have probably received a life sentence." Rose v. State, 675 So.2d 567, 570 (Fla.1996) (quoting Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995)).

HABEAS CORPUS
We also deny Hunter's claim that his appellate counsel was ineffective. The issue of appellate counsel's ineffectiveness is appropriately raised in a petition for writ of habeas corpus. See Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000). However, in order to grant habeas relief on the basis of ineffectiveness of appellate counsel, this Court must determine:
[W]hether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986); see also Freeman, 761 So.2d at 1069; Thompson v. State, 759 So.2d 650, 660 (Fla.2000). "The defendant has the burden of alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based." Freeman, 761 So.2d at 1069.
First, Hunter alleges that appellate counsel was ineffective due to an actual conflict of interest.[12] This issue essentially mirrors the conflict of interest claim raised in Hunter's 3.850 appeal which was *798 filed with this petition for writ of habeas corpus. "[H]abeas corpus petitions are not to be used for additional appeals on questions which could have been ... or were raised on appeal or in a rule 3.850 motion. ..." Parker v. Dugger, 550 So.2d 459, 460 (Fla.1989). Accordingly, in view of our discussion and decision above, this claim provides no basis for relief.
Next, Hunter argues that appellate counsel was ineffective for failing to argue on direct appeal that Hunter's death sentence was disproportionate to the life sentence imposed on codefendant Boyd. It is well settled that equally culpable codefendants should be treated alike in capital sentencing. See, e.g., Ray v. State, 755 So.2d 604, 611 (Fla.2000). "Where a more culpable codefendant receives a life sentence, a sentence of death should not be imposed on the less culpable defendant." Id. This Court, however, has rejected proportionality claims where the defendant was determined to be more culpable than his codefendant. See, e.g., Jennings v. State, 718 So.2d 144, 153-54 (Fla.1998) (holding that fact codefendant received life sentence did not prevent imposition of the death penalty on defendant, whom the trial court found to be the actual killer and to be more culpable); Howell v. State, 707 So.2d 674, 683 (Fla.1998) ("Based on the evidence presented regarding Howell's greater culpability in the murder as compared to his codefendants, we find that his death sentence is proportional.").
Although Hunter now urges equal culpability with codefendant Boyd in the present case, the trial court decided this issue against Hunter in its sentencing order, considering the disparate treatment given to Hunter's three codefendants as a mitigating circumstance. In so doing, the court stated:
As indicated earlier, one mitigator not raised in the memorandum provided by defense counsel, but argued at trial was the disparate treatment of co-defendants. The Court has considered that the co-defendants in this case, specifically Mr. Boyd, Mr. Anderson and Mr. Pope have been treated differently.
Mr. Pope plead nolo contendere as charged to each of the offenses of which Mr. Hunter has been convicted (and three additional armed robbery offenses as well) and the State has, in exchange for Mr. Pope's plea and his testimony at trial, agreed to recommend concurrent life sentences. Mr. Pope's situation can be distinguished from Mr. Hunter's in that Mr. Pope was not the actual shooter and his conduct was less aggravating than that of Mr. Hunter.
Mr. Boyd was tried with Mr. Hunter and the jury recommended life for Mr. Boyd. Although Mr. Boyd, except for one attempted second degree murder conviction, was convicted of the same charges as Mr. Hunter, the Court finds reasonable that Mr. Boyd's family background and his degree of participation in the crimes were sufficient to justify different treatment by the jury and their recommendation.
Finally, as to Mr. Anderson, the fourth co-defendant in the Indictment, Mr. Anderson still awaits trial, so there is no way to weigh any treatment regarding Mr. Anderson until, and if, he is convicted of said offenses.
We find that the trial court adequately addressed the disparate sentences given Hunter and codefendant Boyd.[13] Accordingly, appellate counsel was not ineffective for failing to raise this issue on appeal.
Lastly, Hunter argues that it would violate the Eighth Amendment's prohibition *799 against cruel and unusual punishment to execute him since he may be incompetent at the time of execution. Hunter concedes that this issue is premature and that he cannot legally raise the issue of his competency to be executed until after a death warrant is issued. See Hall v. Moore, 792 So.2d 447, 450 (Fla.2001); Fla. R.Crim. P. 3.811(c). Thus, this claim is without merit.

CONCLUSION
For the reasons set forth above, we affirm the trial court's denial of postconviction relief. We also deny Hunter's petition for writ of habeas corpus.
It is so ordered.
SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS, and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only.
NOTES
[1] In so doing, the trial court found the following two aggravating circumstances: (1) prior violent felony conviction; and (2) capital felony committed during a robbery. In addition to the eight contemporaneous convictions in the case, Hunter had prior convictions for aggravated battery, shooting or throwing a deadly missile into an occupied vehicle, and attempted armed robbery. The trial court found the following ten nonstatutory mitigating circumstances: (1) fetal alcohol syndrome; (2) separation from siblings; (3) lack of motherly nurturing and bonding; (4) physical abuse; (5) emotional abuse and neglect; (6) unstable environment; (7) violent environment; (8) lack of positive role models; (9) death of adoptive mother; and (10) narcissistic personality disorder. See id. at 247.
[2] Huff v. State, 622 So.2d 982 (Fla.1993).
[3] These claims included: (1) trial counsel was ineffective during the guilt phase for failing to (a) challenge the State's case through the knowledge of color photographs which were exculpatory, (b) failing to move for a hearing under Richardson v. State, 246 So.2d 771 (Fla.1971), before the trial court due to the State's untimely disclosure of photographs, (c) failing to utilize color photographs during trial, and (d) failing to disclose to the trial court unauthorized alterations in the photographs made by the State between the deposition of Donald Clark and Hunter's trial; (2) trial counsel was ineffective for failing to (a) provide adequate background information to Hunter's mental health expert and present additional mitigating circumstances, (b) object to the introduction of collateral crime victim evidence, (c) object to improper prosecutorial comments, and (d) adequately question potential jurors during voir dire; (3) Hunter's death sentence is invalid because (a) the jury instructions shifted the burden to Hunter to prove death was inappropriate, (b) the jury instructions improperly diluted the jury's sense of responsibility, and (c) the jury instruction on the cold, calculating, and premeditated aggravating circumstance was erroneous; (4) Hunter's trial was fundamentally unfair because (a) the trial court abused its discretion in failing to conduct an adequate mental health examination, (b) the trial court failed to appoint adequate mental health experts and conduct competency hearings, (c) the trial court erred by concluding death was the appropriate penalty, and (d) the trial court erred in failing to declare a mistrial when a State expert improperly gave his opinion on Hunter's credibility; (5) Florida's capital sentencing scheme is unconstitutional; (6) newly discovered evidence establishes that Hunter's conviction and sentence are constitutionally unreliable; (7) Hunter's death sentence rests upon an unconstitutional automatic aggravating circumstance; (8) the prosecutor made inflammatory and improper comments; (9) rule 4-3.5(d)(4), Rules Regulating the Florida Bar, is unconstitutional; (10) execution by electrocution is cruel or unusual punishment or both; (11) Hunter's trial was fraught with substantive and procedural errors; (12) Hunter was denied a fair trial due to an actual conflict of interest by the public defender's office; and (13) trial counsel was ineffective for failing to file pretrial motions challenging the identification of Hunter by State witnesses Cooley and Howard.
[4] The trial court granted an evidentiary hearing on claim (13) to the extent Hunter was arguing that exculpatory photographs existed that trial counsel could have used to demonstrate inconsistencies between the in-court identifications by State witnesses Cooley and Howard and their identifications when they were or would have been shown the photographs. The trial court, however, summarily denied Hunter's argument within claim (13) that trial counsel was ineffective for failing to file pretrial motions challenging the identity of Hunter as legally insufficient.
[5] Hunter alleges: (1) trial counsel had an actual conflict of interest; (2) trial counsel was ineffective for failing to challenge the State's case through the use of photographic evidence; (3) the prosecutor made inflammatory and improper comments and counsel was ineffective for failing to object; (4) the jury instructions during the penalty phase were constitutionally invalid; (5) Florida's capital sentencing scheme is unconstitutional; (6) the trial court failed to appoint adequate mental health experts and conduct competency examinations; (7) Hunter's death sentence is disproportionate; (8) the trial court failed to declare a mistrial when a State expert improperly gave his opinion on Hunter's credibility; and (9) Hunter's death sentence rests upon an unconstitutional automatic aggravating circumstance.
[6] We find issues (3), (4), (5), (6), (7), (8), and (9) to be procedurally barred because they could have been or were raised on direct appeal. See Peede v. State, 748 So.2d 253, 256 n. 6 (Fla.1999); Harvey v. Dugger, 656 So.2d 1253, 1256 (Fla.1995). Indeed, claims (5), (6), (7), and (8) were raised and rejected by this Court on direct appeal. See Hunter, 660 So.2d at 247-48, 252-54. Similarly, Hunter's argument within issue (4) that the trial court improperly instructed the jury on the cold, calculated, and premeditated aggravating circumstance was raised and rejected on direct appeal. See id. at 252-54. Lastly, to the extent Hunter argues in issue (3) that trial counsel was ineffective for failing to object and move for a mistrial after the prosecutor's alleged improper comment during opening statement, we conclude that Hunter has not facially satisfied the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Even assuming that the prosecutor's isolated comment was improper and that counsel was deficient for failing to object, Hunter has failed to demonstrate prejudice in his pleadings. See id. at 694, 104 S.Ct. 2052.
[7] Hunter and Boyd were tried together in a joint trial. The jury found Hunter guilty of one count of first-degree murder, three counts of attempted first-degree murder, three counts of armed robbery, and one count of attempted armed robbery. The jury found Boyd guilty of one count of first-degree murder, two counts of attempted first-degree murder, one count of attempted second-degree murder, three counts of armed robbery, and one count of attempted armed robbery. The jury recommended a death sentence for Hunter and a life sentence for Boyd.
[8] Cooley testified at the postconviction hearing that he did not recall telling collateral counsel's investigator that Boyd was the shooter when shown his photograph.
[9] For example, trial testimony established that Hunter was the only defendant armed with a real gun; Hunter had possession of the gun when he exited the vehicle in Daytona Beach; Hunter approached the victims and said "give it up"; Hunter appeared to be giving all the orders and doing the talking; Hunter was identified in court as possessing the .25 automatic chrome gun during the incident; Hunter returned to the vehicle with the chrome gun; and Hunter told Cowan, the driver of the car, that he shot the victim because he tried to run. Moreover, Cooley identified Hunter, not Boyd, as the shooter in court, at a time when both codefendants were sitting in the courtroom within Cooley's view.
[10] The record, however, does reveal that Hunter raised this argument in his written closing arguments filed with the trial court following the postconviction evidentiary hearing, and the State was permitted to file written closing arguments fifteen days after Hunter, which it did.
[11] We also found that imposition of the death penalty in Ray was disproportionate even without a comparison to the codefendant's sentence. See id. at 612.
[12] Hunter's appellate counsel was the same attorney who represented him at trial.
[13] The trial court also considered and rejected the statutory mitigating circumstance that Hunter was an accomplice in the capital felony committed by another person and his participation was relatively minor:

The evidence indicated that the defendant was the only person in this crime spree that carried a real gun. He was the shooter and was the dominant person throughout the crimethe planning, the execution and subsequent flight. There is no competent evidence that the defendant was an accomplice. The Court considered the defendant's statement at the penalty phase. This is not a mitigating factor.
Sentencing Order at 6, State v. Hunter, No. 92-34170CFAES (Fla. 7th Cir.Ct. Aug. 18, 1993).