[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 5, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-13574

_____

D. C. Docket No. 02-00660-CV-ORL-31KRS

JAMES EUGENE HUNTER,

Petitioner-Appellant,

versus

SECRETARY, DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(January 5, 2005)**

Before CARNES, BARKETT and HULL, Circuit Judges.

CARNES, Circuit Judge:

Around midnight on September 16, 1992, four young friends were hanging out on benches in front of the Munch Shop, a local eatery near the campus of Bethune-Cookman College in Daytona Beach, Florida. Taurus Cooley, Michael Howard, Theodore Troutman, and Wayne Simpson were college students who often gathered there to "talk and chat and carr[y] on" because Simpson's father owned the Munch Shop. They did not know that night would be different from any other.

Not far away, another group of four young men were together but for less innocent purposes. James Eugene Hunter, also known as "Michael Miller" or "Psycho," was one of them. He was in a car headed to Daytona Beach. With him were Charles Anderson, Eric Boyd, and Bruce Pope. Two young women were also in the car. One of them was Hunter's girlfriend, Tammie Cowan. The men had with them two long-barrel, black BB guns and a chrome .25 caliber automatic handgun.

In Deland, Florida, about twenty miles west of Daytona, Hunter instructed Cowan, who was driving, to stop the car. Hunter and the other three men got out of the car with the guns. They confronted a man, Reggie Barkley, who was riding his bicycle down the road toward them. Pointing their guns at him, Hunter and the

2

others ordered him to lay on the ground, screaming at him to "give it up." They

searched Barkley's pockets and then told him to run into the woods, which he did.

After robbing Barkley, Hunter and his friends ran back and jumped into the car,

and Hunter told Cowan to drive to Daytona.

When they arrived in Daytona around midnight, Hunter first had Cowan stop

at a house where he planned to buy marijuana, but no one was home. They left the

house and proceeded to drive through Daytona, presumably looking for drugs.

As they drove near the campus of Bethune-Cookman College, Hunter and the

others saw the four young men sitting on benches in front of the Munch Shop.

After seeing the four young men, Hunter instructed Cowan to stop the car

about three blocks away. All four of the men got out of it there. Hunter carried

the silver automatic handgun, while two of the others carried the long BB guns.

They walked around to the front of the building where Cooley, Howard, Troutman,

and Simpson were sitting. At first the friends didn't think much about the four

men walking toward them, assuming they were college students, too. When

Hunter and two of his cohorts pulled out their guns and told the young men to

"give it up," they thought it must be a joke. They realized it was no joke when Eric

Boyd put his "big, long gun" to Troutman's neck and ordered him to get on the

ground. At the same time, Hunter held his small handgun to Troutman's neck, and

one of the other robbers put the long barrel of his gun into Howard's back.

Because the young men "didn't want to make no false moves for them to shoot us," they complied with every order. Troutman and Simpson both lay on the ground, as they were told. Howard emptied his pockets, showing that he had only four pennies and some keys. Unsatisfied, one of Hunter's group told Howard he wanted his clothes. Howard obediently stripped down to his underwear and handed over his Nike tennis shoes, his shirt, his short pants, and his watch. Then, Howard got down on the ground as well. Nearby, Hunter kept his gun pointed at Cooley, ordering him to take off his shirt, which Cooley did.

As Cooley was handing over his shirt, he was face-to-face with Hunter. At that moment, Hunter opened fire, shooting Cooley in the chest, just above his heart. Cooley dropped the shirt and fell back. Hunter paused a few seconds and then continued shooting down the line. He stood behind Howard, who had been sitting on the ground, and shot him in the back as Howard got up and began to flee. The bullet penetrated Howard's right shoulder blade, lodging in his body. Hunter next came to Troutman, who was lying face down on the ground. While Hunter's cohorts snatched Troutman's shoes off his feet and a twenty-dollar watch off his arm, Hunter stood over Troutman and shot him in the back. Finally, it was Simpson's turn. Troutman would later recount that his friend Simpson, who had

4

heard the others being shot, must have known he was next. He described how Simpson was flinching and looking over his shoulder as he lay on the ground. Hunter shot Simpson in the back.

After being shot, each of the four young men was able to run away. They fled in a desperate search for help, running up the stairs of an apartment building, where Wayne Simpson pounded on the door and on a window so hard that he knocked out the glass. But then, as one of the others described it, "Wayne just collapsed, Wayne laid down. And then he said—and I ran up to the steps and he said—I said, Wayne, what's wrong? He said, I'm going to die." The bullet from Hunter's handgun had ricocheted through Wayne Simpson's right lung and his heart, and the young man, only nineteen-years old, bled to death on the steps of the apartment building where he had gone seeking help.

Hunter was convicted by a jury of the first-degree murder of Wayne Simpson, as well as for three counts of attempted first-degree murder, three counts of armed robbery, and one count of attempted armed robbery. Following a sentence hearing, the jury recommended death by a vote of nine to three, and the trial court imposed that sentence. The Florida Supreme Court affirmed the conviction and sentence on direct appeal. Hunter v. State, 660 So. 2d 244, 254 (Fla. 1995) ("Hunter I"). Hunter filed a state collateral petition. After holding an

evidentiary hearing on some of his claims, the trial court denied relief. The Florida Supreme Court affirmed that denial of relief and at the same time denied Hunter's petition for state habeas relief. Hunter v. State, 817 So. 2d. 786, 799 (Fla. 2002) ("Hunter II").

Hunter then filed in the United States District Court for the Middle District of Florida a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. That court denied the petition and denied Hunter's request for a certificate of appealability. We granted him a certificate on two issues: (1) whether he was deprived of his right to counsel under the Sixth Amendment as a result of his trial counsel laboring under a conflict of interest; and (2) whether his trial counsel rendered ineffective assistance by failing to present the jury with certain evidence concerning photographs that had been taken of the four robbers shortly after the crime.

**I.**

As to the first claim Taurus Cooley, a surviving victim, was one of the most important witnesses for the State at the guilt stage of the trial; he identified Hunter as the robber who had fired the shots that killed Wayne Simpson and injured the other three victims. Hunter was represented by George Burden, a member of the Volusia County Public Defender's Office. Before Hunter's trial, other members of

6

that same office had represented Cooley on a number of unrelated criminal charges. Some of that legal representation of Cooley had occurred within a year preceding the trial. The record does establish that Cooley had a criminal history, including some convictions, but it is not clear that there were any charges pending against him at the time of Hunter's trial. The issue arises because Burden did not attempt to use Cooley's criminal history or any charges that may have been pending against Cooley to impeach his testimony. That, argues Hunter, entitles him to relief on his conflict of interest claim.

At the evidentiary hearing on this issue in the state collateral proceeding, Burden testified that at the time of the trial he did not know anything about any of Cooley's convictions or criminal charges. Hunter finds that testimony more difficult to believe than the state courts did. After hearing Burden testify on the matter, the state trial court credited his testimony and found as a fact that at the time of the trial Burden was unaware of any past or pending criminal charges against Cooley. From that fact the state court reasoned that Burden's representation of Hunter could not have been adversely affected by any conflict of interest stemming from his office having represented Cooley in regard to any prior criminal matters. See Hunter II, 817 So. 2d at 792–93. The Florida Supreme Court affirmed that finding and conclusion. Id. at 793 ("[T]he trial court was

entitled to conclude that since trial counsel was not even aware of the public defender's prior representation of Cooley, such prior representation could not have affected his representation of Hunter." ). The district court found the state court factfinding reasonable and the decision neither contrary to, nor an unreasonable application of, clearly established federal law as delineated in Supreme Court precedents. See 28 U.S.C. § 2254(d)(1). We agree.

To the extent that Hunter assaults the factual premise of the state court decision on this issue by contending that Burden must have known that others in his office had represented Cooley on unrelated matters, his argument is foiled by the shield that 28 U.S.C. § 2254(e)(1) throws around those findings. Under that provision of the AEDPA, state court factual determinations are presumed correct and a federal habeas petitioner is stuck with them unless he can rebut their presumed correctness with clear and convincing evidence to the contrary. Hunter has never presented any evidence, much less clear and convincing evidence, to show that Burden had been aware at the time of this trial that others in the Public Defender's Office represented Cooley on past or pending criminal matters. The factual premise of the state court decision stands.

Hunter's primary attack on the state court's decision resolving the conflict of interest issue focuses on the seemingly unassailable legal premise of that decision:

8

An attorney's performance must be adversely affected by the conflict of interest before there is a constitutional violation. See Hunter II, 817 So. 2d at 792–93. If a trial court improperly requires joint representation of co-defendants over timely objection, reversal is automatic. See Holloway v. Arkansas, 435 U.S. 475, 487–90, 98 S. Ct. 1173, 1180–82 (1978). In all other conflict situations, there is no Sixth Amendment violation, and thus no reversal, absent a showing that an actual conflict of interest adversely affected counsel's performance. See Mickens v. Taylor, 535 U.S. 162, 167–174, 122 S. Ct. 1237, 1241–45 (2002) ("Since this was not a case in which (as in Holloway) counsel protested his inability simultaneously to represent multiple defendants . . . it was at least necessary, to void the conviction, for petitioner to establish that the conflict of interest adversely affected his counsel's performance."); Strickland v. Washington, 466 U.S. 668, 691, 104 S. Ct. 2052, 2067 (1984) ("Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" (quoting Cuyler v. Sullivan, 446 U.S. 335, 348, 350, 100 S. Ct. 1708, 1718, 1719 (1980))).

Against those clear Supreme Court decisions, Hunter offers some loose language from the opinion in Freund v. Butterworth, 165 F.3d 839 (11th Cir. 1999) (en banc). One part of that lengthy en banc opinion quotes a passage from the

9

panel opinion. Id. at 860. In that passage is a description of the burden a petitioner

must carry in order to obtain relief on conflict of interest grounds. Hunter relies on

the part of the quoted passage that discusses the adverse effect requirement. It

describes that requirement in these terms:

> [H]e must show some link between the actual conflict and the decision
> to forgo the alternative strategy of defense. In other words, "he must
> establish that the alternative defense was inherently in conflict with or
> not undertaken due to the attorney's other loyalties or interests."

Id. (quoting Freund v. Butterworth , 117 F.3d 1543, 1580 (11th Cir. 1997),

vacated, 135 F.3d 1419 (11th Cir. 1998) (granting rehearing en banc) (quoting

United States v. Fahey, 769 F.2d 829, 836 (1st Cir. 1985))). Those two sentences,

Hunter argues, establish that a petitioner need not show adverse effect if "the

alternative defense was inherently in conflict with" the attorney's other loyalties

and interests, even if the attorney was unaware of the conflict. Ergo, he is entitled

to relief from the state court decision rejecting his conflict of interest claim for lack

of adverse effect, and the judgment left intact by that decision. Not counting the

difficulty in differentiating between "inherent" and "non-inherent" conflicts, there

are no fewer than four reasons why Hunter's argument fails.

First, Hunter's argument ignores the sentence following the part of the

Freund en banc opinion that he quotes. Lest anyone misunderstand the quoted

passage, the en banc Court immediately said: "It bears repeating, however, that

10

'[p]rejudice is presumed only if the defendant demonstrates that . . . "an actual conflict of interest adversely affected his lawyer's performance."'" Id. at 860 (alterations in original) (quoting Strickland, 466 U.S. at 692, 104 S. Ct. at 2067 (quoting Cuyler, 446 U.S. at 348, 100 S. Ct. at 1718)). Hunter's argument misconstrues the Freund opinion.

Second, the Freund en banc Court actually affirmed the denial of relief in that case, and the opinion explained that the Court did so both because none of the alleged conflicts amounted to an actual conflict, and because even if the circumstances in that case had presented actual conflicts of interest, no adverse effect on counsel's performance flowed from any of them. Id. at 841, 866. A decision denying relief because no adverse effect has been shown cannot establish that relief can be granted without a showing of adverse effect. To suggest it can is to propose that every proposition establishes the converse of itself.

Third, even if the Freund decision had established that no adverse effect was necessary in order for relief to be granted on a conflict of interest claim, any such holding would have been implicitly overruled by the Supreme Court's later decision in the Mickens case, which held that an adverse effect showing was required, save only where counsel was forced over objection to simultaneously represent co-defendants. See generally In re Provenzano, 215 F.3d 1233, 1235

11

(11th Cir. 2000) (per curiam) ("We would, of course, not only be authorized but also required to depart from [the prior decision of this Court] if an intervening Supreme Court decision actually overruled or conflicted with it."); Cottrell v. Caldwell, 85 F.3d 1480, 1485 (11th Cir. 1996) ("Where prior panel precedent conflicts with a subsequent Supreme Court decision, we follow the Supreme Court decision.").

Fourth, in any event, Hunter's argument that our Freund decision establishes that he is entitled to relief from the state court judgment against him fails because state courts are not required to follow our decisions. They, like we, are required to follow Supreme Court decisions, but we may not set aside state court judgments because they conflict with our own decisions. Insofar as legal issues are concerned, only where the state court judgment rests on a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" may federal habeas relief be granted. 28 U.S.C. § 2254(d)(1); see also Yarborough v. Alvarado, 541 U.S. 656, ___, 124 S. Ct. 2140, 2147 (2004) ("[C]learly established law as determined by this Court 'refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.'" (quoting Williams v. Taylor, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523 (2000))); id. at 2150

12

("'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly.'" (alterations in original) (quoting Woodford v. Visciotti, 537 U.S. 19, 24–25, 123 S. Ct. 357, 360 (2002) (per curiam))); Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 1172 (2003) ("In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.").

There is no clearly established federal law, as determined by Supreme Court decisions, that supports Hunter's position. Just the opposite. The Supreme Court's Cuyler, Strickland, and Mickens decisions all go against Hunter. It is his position on this issue, and not the state court's decision of it, that is contrary to clearly established federal law as laid down in Supreme Court decisions.

For all four of these reasons, we reject Hunter's contention that he meets the requirements of § 2254(d)(1) for relief from the state courts' decision that he failed to establish a conflict of interest that violated the Sixth Amendment, because his counsel could not have been affected by a conflict of which he was unaware.

We also reject Hunter's argument that an exception to the adverse effect requirement ought to be carved out for this case because if the State had lived up to

13

its disclosure obligations and told his trial counsel Burden about witness Cooley's criminal record, Burden would have been aware of the conflict of interest. Hunter seems to be saying that it is unfair for the attorneys representing the State of Florida to have deprived him of the opportunity to have been prejudiced by the conflict of interest. Wholly apart from the strictures of § 2254(d)(1), it ought to be evident that not even capital defendants have the right to the State's assistance in sewing the seeds of reversible error. There is no constitutional right to have constitutional violations occur or to be prejudiced by any that do.

## II.

The second issue for which we granted a certificate of appealability involves Hunter's claim that his trial counsel rendered ineffective assistance by failing to utilize certain color photographs that showed the clothing Hunter and his co-defendants were wearing a short time after the robberies and murder. The photographs could and should have been used, Hunter argues, to undermine the testimony of the surviving victims who identified Hunter as the shooter. No pretrial motion was filed to suppress that identification testimony, nor were the photographs used to undermine that testimony before the jury. Although there was some conflicting testimony surrounding the issue at the evidentiary hearing, the

14

state courts did find that trial counsel Burden knew of the photographs at the time of the trial.  Hunter II, 817 So. 2d at 794; Hunter I, 660 So. 2d at 250–51.

Applying the standards set out in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984), the state courts rejected Hunter's claim after deciding that he had failed to show prejudice. They concluded he had not shown a reasonable probability of a different result if Burden had used the photographs to the fullest possible extent.  Hunter II, 817 So. 2d at 793–97.  The district court concluded that Hunter had failed to carry his heavy burden under § 2254(d)(1) of demonstrating that the state court decision on this issue was either contrary to, or an unreasonable application of, clearly established federal law set out in Supreme Court decisions. We agree.

Four black males participated in the robbery, but only one of them fired the shots that wounded Cooley, Howard, and Troutman, and killed Simpson.  The testimony before the jury was that at least some of the robbers were wearing caps pulled down over part of the face.  Cooley positively identified Hunter as the shooter and testified that Hunter had been wearing either a red hat or a red shirt, or both, at the time of the crime.  Howard testified that he had seen the one who shot Cooley, and that one was Hunter.  He also said that he then saw the gun waved in his direction and heard three more shots.  He said that the man doing the shooting

15

wore "blue jean pants, red shirt, red cap." Troutman gave varying testimony about whether he could identify the shooter, but ended up saying on redirect that while he had seen a silver gun in Hunter's hand he did not actually see who did the shooting. He remembered that the shooter was wearing a ball cap, but he could not recall the color of the shooter's shirt.

Bruce Pope, one of the robbers, testified for the State at the trial. During direct examination, Pope told the jury that during the crime Hunter had been wearing a shirt with some white in it, and that one of the other robbers—he could not recall which one—was wearing a red shirt. He also suggested that at some point between the robbery of bicycle-riding Reggie Barkley and the robbery and murder involved in this case, Hunter and one of the other robbers may have switched shirts. On cross-examination, Pope did agree with attorney Burden that "Hunter [had] the same shirt on all that time," although it is not entirely clear what Pope understood "all that time" to mean.

The car load of robbers was initially stopped in Ormond Beach by Deputy Graves around 12:40 a.m., which was approximately twenty-five to forty minutes after the robberies and murder in this case took place in Daytona Beach. About the clothing the men were wearing when he pulled the car over, Graves testified at trial that two of the suspects were wearing clothing that matched the BOLO (Be On the

16

Look Out bulletin) arising from the Barkley robbery. The BOLO contained "[i]nformation like red shorts, white shirt, combinations, color combinations." Graves also testified that the field investigation cards he filled out that morning indicated Bruce Pope was wearing a Miami Hurricanes outfit at the time of the stop. Those cards were marked as exhibits and discussed as evidence. They show that Hunter was wearing white when the four robbers were stopped.

In closing argument, Burden repeatedly stressed that the testimony had established that the shooter was wearing a red shirt, while Hunter was wearing a white shirt during, or at least only a few minutes following, the robberies and murder. He pointed out that the field investigation cards Deputy Graves had filled out showed that Hunter was wearing a white shirt when stopped. Summarizing, the Florida Supreme Court said that, "a review of trial counsel's closing argument reveals at least eleven references to the evidence that Hunter was wearing a white shirt while witnesses testified that the shooter was wearing red clothing, i.e., a red shirt or red hat." Id. at 796; see also id. at 795 (quoting from the trial court's findings, which stated, "[f]urther, at trial the uncontroverted evidence was that the shooter was wearing a red shirt and while, at the time of the arrest minutes after the shooting, Defendant was wearing a white shirt. Defense counsel argued these facts extensively during closing argument, including the fact that Deputy Graves' field

17

interview cards also showed the Defendant wearing a white shirt at the time of the arrest.").

The prosecutor did not challenge Burden's argument to the jury that the evidence established the shooter had worn a red shirt or cap while Hunter had on a white shirt when stopped. Instead, the prosecutor accepted the premise that Hunter was wearing a white shirt when the car was stopped in another town at least twenty minutes after the robberies and murder had taken place. His explanation to the jury was this: "They had all the time, once again that fifteen to twenty minutes from the time they left the scene at that Munch Shop after shooting those four men until the time they got stopped up in Ormond to take off their shirts, to change their shirts, to get rid of the caps." Because they had been smart enough to get rid of the caps they had been wearing, he argued, they were smart enough to have changed shirts, too. Burden got the last word before the jury, and he responded that it was uncontroverted Hunter had been wearing a white shirt. He also argued that the State had presented no evidence any of the robbers had switched shirts.

Hunter's contention is that Burden should have presented to the jury the additional evidence that came out at the evidentiary hearing in the state collateral proceeding, especially the color photographs showing Hunter with a white shirt on. In rejecting Hunter's argument on this ineffective assistance claim, the Florida

18

Supreme Court reasoned that while the use of the photographs in question might have aided the defense presentation of the identity issue to some extent, they were merely cumulative of other evidence that came out at trial, and there was extensive evidence of Hunter's guilt. Id. at 796. Based on all of the circumstances, the state court could not say that Hunter had established the requisite prejudice that Strickland demands a petitioner show. Id. We cannot say that the Florida Supreme Court's decision is contrary to, or involves an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States. See 28 U.S.C. § 2254(d)(1).

The totality of the evidence about the photographs that were taken after Hunter and the others were arrested would not have helped the defense case and may well have undermined it. Deputy Graves testified in the evidentiary hearing that he could not recall whether all of the men were shirtless when he stopped their car, but at least some of them were. Although his field identification cards show that Hunter had on a white Florida Gators T-shirt, it is unclear when that specific information was entered onto the card. Graves testified at the evidentiary hearing that by the time Officer McLean arrived on the scene the four suspects did not have on shirts. He did not know when the shirtless ones put shirts on.

Officer McLean, who brought Barkley, the victim of the earlier robbery, to

19

the scene of the stop, also testified at the evidentiary hearing. He said that he had arrived at the scene of the stop at approximately 2:10 a.m., which would have been approximately two hours after the robberies and murder in this case, which had occurred about midnight. McLean testified that neither Hunter nor any of the other three suspects were wearing a shirt at the time. He transported the suspects to the police station and he testified that Hunter, and probably all of the others, were not wearing a shirt when they arrived at the police station. Because it was a hot night, the air conditioning was on at the station. The men complained about being cold, and McLean permitted them to "grab whatever shirts they claimed to be theirs."

Although there are color photos taken sometime after the stop that morning showing that the four men had shirts on and that Hunter's shirt was white, the evidentiary hearing also revealed photos from some other time that morning which showed Hunter and at least two of the others without shirts. Deputy Graves testified that the photographs showing Hunter and the others without shirts were taken at the time he pulled over their car. Again, that was from twenty-five to forty minutes after the robberies and murder in this case took place.

If defense counsel Burden had put into evidence at trial the photos showing Hunter in a white shirt, that would have invited the State to put in the photos showing the suspects without shirts. The State could have had the officers explain

20

to the jury that, at some point soon after robberies and murder in this case were committed, the four men were not wearing shirts and that Hunter had an opportunity to switch shirts. The totality of the new evidence would have netted out against Hunter. It would have deprived the defense of the chance to argue to the jury, as Burden did in his closing, that it was clear Hunter had been wearing a white shirt the entire time and there was no evidence at all to support the prosecutor's theory that he had changed shirts. Likewise, nothing about the color photographs would have compelled suppression of the identification testimony at trial.

Nor is there anything to Hunter's additional contention that if Burden had explored the photographic evidence more thoroughly he would have discovered that Detective Flynt, who assembled the photos into packages, never showed those photos to the surviving victims because they had told him they were unable to identify the robbers. The resulting testimony, Hunter argues, would have made all the difference at trial. But the record establishes otherwise.

Burden brought out at trial and argued in closing that Detective Flynt had neither shown the post-arrest photos to any of the surviving victims nor had he arranged any lineups for them. Burden stressed that the robbers had caps pulled down to hide their faces, and that none of the surviving victims were able to

describe the robbers except for the clothing they wore. Typical of his closing argument on this point is the following:

> Did Detective Flynt tell you about the photo lineups he did for these victims? Did he go through that? Did he go through the physical lineup he did with all these victims? No. He never did. And he also told you when he interviewed them they couldn't give a description other than clothing. Right after it happened, that's all the description they could give. Lack of evidence. Reasonable doubt.

While conceding at the state collateral evidentiary hearing that the surviving victims had been unsure of identity, Detective Flynt did not say that any of them had ever told him they could not identify the robbers.

For all of these reasons, the Florida courts' decision rejecting this claim is neither contrary to, nor an unreasonable application of, clearly established federal law within the meaning of § 2254(d)(1).

AFFIRMED.