755 So.2d 604 (2000)
Terry Paul RAY, Appellant,
v.
STATE of Florida, Appellee.
No. SC92421.
Supreme Court of Florida.
February 3, 2000.
Rehearing Denied May 1, 2000.
*606 Nancy A. Daniels, Public Defender and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, Florida, for Appellee.
PER CURIAM.
We have for review the judgment and sentence of the trial court adjudicating Terry Paul Ray guilty of first-degree murder, robbery, and grand theft, and imposing a sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm the conviction for first-degree murder but reduce the sentence to life imprisonment.
On September 17, 1996, Terry Paul Ray (Ray) and his cousin, Roy Hall (Hall), agreed to rob the Stateline Liquor Store near the Florida-Georgia border. Ray traveled to Hall's home earlier in the evening and while there the two devised the robbery plan. Ray and Hall borrowed a pickup truck from one of Hall's relatives. Inside the truck they loaded a number of weapons and ammunition, including a Davis Industries 380 pistol, a SKS 7.62 millimeter rifle and magazine, a 9 millimeter Berretta pistol, an M-1 carbine semiautomatic rifle, multiple .30-caliber magazines, and three 9 millimeter magazines.
Ray and Hall entered the store shortly after 10 p.m., as the store was closing. Both were disguised in dark masks which completely obscured their faces, and both wore gloves and dark clothing.[1] According *607 to witnesses, the short, stocky man (Hall) came in first, armed with a handgun, and did all the talking. He gave orders to the victims and to his accomplice and threatened to kill the victims if they failed to comply with his demands. The taller, slimmer man (Ray) stood in the background, armed with a handgun and an M-1 rifle, which was slung over his shoulder. Once they had gotten the money, Hall demanded the keys to an employee's 1987 Nissan Sentra and directed Ray to bring the car around. The robbery took approximately five minutes. Store employees called 911 soon after Ray and Hall left. Four sheriffs deputies responded to the call.
Upon leaving the store, Ray and Hall, pursuant to their plan, traveled to a nearby location to abandon the Sentra and resumed travel in the pickup truck. Shortly thereafter, the pickup truck developed a mechanical problem, most likely a dragging muffler or exhaust pipe. The two pulled off the road to fix the problem. Hall climbed under the truck while Ray held a flashlight. They were in the process of examining the truck when Deputy Lindsey appeared. Lindsey radioed the station and told them he was stopping near a red or orange pickup truck, which was already stopped. This communication occurred approximately twelve minutes after the 911 call reporting the liquor store robbery. A few minutes after his initial radio contact, Lindsey called for backup.
Shortly after the call, a gun battle ensued, during the course of which Lindsey was killed. Ray and Hall were in the process of escaping in the pickup truck just as Deputy Wade arrived on the scene, between 10:30 and 10:45 p.m. Wade testified that he observed Lindsey slumped over behind the open driver's door of his patrol car, with his shotgun beneath him. Lindsey had been shot in the right leg and fatally shot in the left temple. The passenger door was open and Lindsey's spotlight was aimed toward the front of his vehicle. Wade saw sparks coming from the rear of the retreating vehicle and heard a popping noise, which he thought at the time was gunfire. Upon reflection, he said he could not be sure it was gunfire, there were no bullet holes in his car, and he did not see any muzzle flashes. The lone civilian witness could only identify the noise as loud or sharp.
Deputy Yancey, who arrived just seconds after Wade, pursued the pickup truck. After a three-mile chase, Deputies Yancey and Leigh surrounded the truck and stopped it. Hall exited the truck, by either falling out or jumping out; he appeared to be shot. Ray got out with his arms in the air. Several items, including an M-1 .30-caliber rifle clip, were removed from Ray's pockets.
Paramedics testified that they treated Ray and Hall at the scene. Hall had gunshot wounds to his head, chest, and right arm, which were caused by a shotgun like the one carried by Lindsey. He was loud and belligerent, and denied killing anyone. At one point, he asked if the deputy had died. Ray had not been shot, but he had sustained an injury to his forehead in a scuffle with police during his arrest.
The M-1 rifle and the Berretta were found in the cab of the pickup truck. The rifle was halfway between the driver's side and passenger's side with the barrel on the floorboard and the stock on the seat. The Berretta lay on the seat directly behind the steering wheel. Two Halloween masks were found behind the front seat. A large cache of weapons was found in the toolbox in the bed of the truck, along with flak jackets, clothing, and the money bags and currency stolen from the Stateline Liquor Store. The exterior of the pickup truck had been struck by buckshot, which came from Deputy Lindsey's shotgun.
Investigation of the scene of the shooting revealed the ground in front of Lindsey's car, where the truck had been parked, was strewn with spent .30-caliber shell casings. Ballistic experts testified all *608 the shell casings were fired from the .30-caliber M-1 carbine rifle. The interior of the pickup truck contained .30-caliber cartridge casings on both sides of the floorboard and the driver's seat. All were fired from the .30-caliber M-1 carbine rifle. The bullets that killed Lindsey were fired from the M-1 rifle.
A single fingerprint, from Ray's left ring finger, was found on the M-1 rifle. Ray's palm prints were also identified on the hood of Lindsey's car. Both Ray and Hall were tested for gunshot residue. Hall, whose results were negative, was tested at the hospital seven hours after the shooting. Ray, who tested positive, was tested four to five hours after the shooting. Nine particles were found on Ray's handsfour on the right palm, three on the left palm, and two on the right back.
The jury was charged and retired to deliberate. They returned with a guilty verdict on each of the counts charged. During the penalty phase, the State presented no evidence. Ray presented evidence of his low I.Q., his stable family life, and his passive and compliant role in the robbery. After this evidence was presented, the jury retired to deliberate on the issue of Ray's sentence. They returned a verdict of death by a vote of seven to five.
A joint sentencing hearing for Ray and Hall was held on November 12, 1997. Ray testified that he participated in the robbery with Hall because he was "in fear" and followed Hall's orders because he thought Hall might hurt him if he did not go along. He also testified to the facts surrounding the shootout with Deputy Lindsey. Ray introduced the transcript of medical testimony presented at Hall's trial which indicated Hall's injuries were consistent with a person standing with his arm raised in a shooting position while facing Deputy Lindsey. After hearing argument, the trial judge orally imposed the death sentence on Ray and sentenced Hall to life. In his sentencing order the trial judge found three aggravating factors: (1) previous conviction of a violent felony, based on the contemporaneous robbery; (2) murder in the course of a felony, based on the contemporaneous robbery; and (3) murder of a law enforcement officer. Mitigating factors included one statutory mitigator, that Ray had no significant criminal history, and five nonstatutory mitigators: (1) Ray has an I.Q. of 75; (2) Ray exhibits signs of suffering from depression; (3) Ray's father suffers from depression and there is a family history of low intelligence; (4) Ray was born premature, possibly resulting in brain damage; and (5) Ray was a loving husband and a caring father to his three children.
On appeal Ray raises six issues, three of which pertain to the guilt phase and three to the penalty phase of this capital proceeding.[2] He first challenges his conviction for first-degree felony murder, arguing that several intervening acts prevented this murder from being connected to the robbery of the liquor store. Ray contends the trial court's failure to instruct the jury on the "independent act" doctrine was reversible error. We reject this argument. While a defendant is entitled to have the jury instructed on the law applicable to his theory of defense, an instruction is not necessary where there is no evidence to support it. There is no evidence to warrant the giving of such a charge in this case. See Hansbrough v. State, 509 So.2d 1081 (Fla.1987); Smith v. State, 424 So.2d 726 (Fla.1982); Lewis v. State, 591 So.2d 1046 (Fla. 1st DCA 1991).
*609 The "independent act" doctrine arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, "which fall outside of, and are foreign to, the common design of the original collaboration." Dell v. State, 661 So.2d 1305, 1306 (Fla. 3d DCA 1995) (quoting Ward v. State, 568 So.2d 452 (Fla. 3d DCA 1990)). Under these limited circumstances, a defendant whose cofelon exceeds the scope of the original plan is exonerated from any punishment imposed as a result of the independent act. Id.See also Parker v. State, 458 So.2d 750 (Fla.1984). Where, however, the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion, no independent act instruction is appropriate. See Lovette v. State, 636 So.2d 1304 (Fla.1994); Perez v. State, 711 So.2d 1215 (Fla. 3d DCA), review denied, 728 So.2d 204 (Fla.1998), and cert. denied, ___ U.S. ___, 119 S.Ct. 1772, 143 L.Ed.2d 801 (1999); State v. Amaro, 436 So.2d 1056 (Fla. 2d DCA 1983). We find that both Ray and Hall were participants in the robbery and the murder resulted from forces they set in motion; therefore, no independent act instruction was warranted.
First, we dispose of Ray's argument that he was relieved of culpability for the shooting because Hall was the one who pulled the trigger. Regardless of the identity of the shooter, Ray would still be liable for Lindsey's death as a cofelon when the murder is committed during the course of a felony. See Lovette, 636 So.2d at 1306. Only a finding that the criminal episode had ceased might give significance to Ray's "Hall as the shooter" argument; and we make no such finding.
Ray next argues the murder was not committed during the course of the robbery or during flight from the robbery. Despite the change in vehicles and the mechanical trouble with the pickup truck which caused them to stop, Ray and Hall were in the process of making their escape from the robbery when they were confronted by Officer Lindsey. The evidence clearly establishes the fact that Ray and Hall jointly planned the execution of the robbery. They secured weapons and ammunition. They displayed and used weapons at the scene of the robbery and stored other weapons and ammunition in the pickup truck. They were still in the vicinity of the crime when they began to have trouble with the truck. The record reflects that the trouble did not make the vehicle unusable; presumably Ray and Hall sought to fix the problem to avoid drawing attention to themselves. They were far from "home free" when they stopped to examine the truck. Ray and Hall had not reached a place of safety; they were still seeking shelter. Thus, the trial court was correct in concluding that the robbery was still in progress and they were still fleeing from the robbery at the time they were confronted by Lindsey. Ray's argument that the criminal episode had ceased is without merit. As we have previously held, the term "during the course of a robbery" encompasses the period of time when the felons are in flight from the scene of the crime. See Griffin v. State, 639 So.2d 966 (Fla.1994).
Ray also attempts to support his independent act argument by stating that he was in custody and removed from the shooting between the officer and Hall. While it is true that the physical evidence supports Ray's claim that he placed his hands on the police cruiser in a seeming posture of surrender, this "surrender" is of dubious effect since it was done at the behest of Officer Lindsey and was not the voluntary act of one who has abandoned his criminal enterprise. Additionally, Ray quickly took advantage of the fact that Lindsey was shot and continued his flight. The shooting of the officer was in furtherance of the original criminal episode and permitted Ray and Hall to continue to flee. See Lovette, 636 So.2d at 1306.
Additionally, the refusal to give a special jury instruction does not constitute *610 error where the charge given adequately addresses the applicable legal standard. See Palmes v. State, 397 So.2d 648 (Fla. 1981). The standard jury instruction in the present case sufficiently set forth the extent of a defendant's liability for acts of a cofelon. In the instruction given jurors were told that before they could find Ray guilty of first-degree felony murder, the State had to prove three elements beyond a reasonable doubt. Those elements were outlined as:
1. Lonny Lindsey is dead.
2. The death occurred as a consequences [sic] of and while Terry Ray was engaged in the commission of the robbery. Or
The death occurred as a consequences [sic] of and while Terry Ray was attempting to commit robbery or the death occurred as a consequences [sic] of and while Terry Ray or an accomplice was escaping from the immediate scene of the robbery.
3. Terry Ray was the person who actually killed Lonny Lindsey or Lonny Lindsey was killed by a person other than Terry Ray but both Terry Ray and the person who killed Lonny Lindsey were principals in the commission of robbery.
No further instruction was warranted. The trial court did not err in failing to give a special instruction on an independent act.
Ray also challenges the trial court's refusal to admit the testimony of Randall Whitney, an accomplice to a previous robbery committed by Hall. The court's ruling in this regard was not error. Admission of evidence is within the discretion of the trial court and will not be reversed unless there has been a clear abuse of that discretion. See Alston v. State, 723 So.2d 148 (Fla.1998). No abuse has been demonstrated since the proffered evidence was both hearsay and irrelevant.
The sum of Whitney's proffered testimony was that in 1984 he had been coerced into committing a robbery with Hall, that the robbery involved a similar modus operandi, and that Hall carried an M-1 rifle during the robbery, a rifle Hall named "the Enforcer." The trial court found that the proffered evidence of Hall's prior involvement with a similar crime was being offered solely to prove bad character and was otherwise irrelevant. The court, however, did permit testimony that Hall previously owned an M-1 rifle. We agree with the trial court.
The proffered testimony requires the jury to draw the inference that Hall's possible coercion of a cofelon in a previous robbery shows that he coerced Ray into participating in the present case. Ray did not testify during the guilt phase of his trial. The only evidence of coercion offered by the defense was Whitney's testimony.[3] That testimony was inadmissible as it violated the rules of evidence. The bulk of Whitney's evidence consisted of inadmissible hearsay. See § 90.801, Fla. Stat. (1995). Whitney testified that the third cofelon from the 1984 robbery communicated Hall's threats to Whitney. Furthermore, Whitney assumed or inferred from other statements made by the third cofelon that acts of destruction which took place at Whitney's home were perpetrated by Hall. Ray sought to introduce Whitney's statements for the truth assertedthat Hall coerced Whitney into committing a crime with Hall in 1984. All of Whitney's "evidence" of this fact were hearsay statements from the third cofelon. This evidence was properly not admitted by the trial court. See Young v. State, 598 So.2d 163 (Fla. 3d DCA 1992).
Ray next challenges the trial court's denial of his request to introduce evidence of his low I.Q. The trial court correctly determined that this evidence was inadmissible during the guilt phase of *611 trial. Testimony regarding I.Q. is not appropriate at this phase of the proceeding because Ray's defense was not insanity. See Chestnut v. State, 538 So.2d 820 (Fla. 1989); Kight v. State, 512 So.2d 922 (Fla. 1987). In contrast Ray relies on Kirkland v. State, 684 So.2d 732 (Fla.1996), where this Court noted the defendant's low I.Q. at the end of a discussion concerning premeditation. The Kirkland case is distinguishable on the issue of the admissibility of this type of evidence because Kirkland's defense was insanity at the time of the offense. In any event, under Kight, the exclusion of such testimony during the guilt phase, if error, would be harmless where, as here, the testimony was permitted during the penalty phase. See Kight, 512 So.2d at 931.
Ray next raises an objection to the aggravating factors imposed in this case. He argues that the order amounted to an improper doubling of aggravating factors. We agree. Applying the same facts to support two separate aggravating factors constitutes improper doubling. See Peterka v. State, 640 So.2d 59 (Fla.1994); Bello v. State, 547 So.2d 914 (Fla.1989). The aggravating factors relevant to this argument are: (1) a prior conviction for a felony involving violence, i.e., the robbery and (2) the murder was committed while Ray was engaged in a robbery. Both aggravating factors were premised upon the same occurrence, the robbery. This constitutes improper doubling. See Kearse v. State, 662 So.2d 677 (Fla.1995).
Ray argues the trial court erred in relying on the State in preparing its order. This issue was not preserved for appellate review and is procedurally barred. We note, however, that this court has clearly stated sentencing orders must be rendered in compliance with Spencer v. State, 615 So.2d 688 (Fla.1993). As Justice Anstead recently reiterated in his concurring opinion in Phillips v. State, 705 So.2d 1320, 1323 (Fla.1997), "the Spencer rule is a mandatory one which must be followed in a death penalty sentencing." Ray correctly points out that the trial judge immediately submitted his written and oral pronouncement of death and that the order, with a few minor exceptions, was taken verbatim from the State's proposed order. In this regard Justice Anstead said:
While the trial court may not have actually abdicated its sentencing responsibility to the State in this case, its failure to follow the procedure set out in Spencer, coupled with its adoption of the State's sentencing memorandum, create both an appearance of partiality and a failure to carefully consider the contentions of both sides and to take seriously the independent judicial "obligation to think through [the] sentencing decision." Gibson v. State, 661 So.2d 288, 293 (Fla. 1995).
Id. at 1324.
Ray challenges the proportionality of the sentence of death under the facts and circumstances of this case. We agree and vacate the death sentence. It has long been established that equally culpable codefendants should receive equal punishment. See Jennings v. State, 718 So.2d 144 (Fla.1998); Scott v. Dugger, 604 So.2d 465 (Fla.1992). Where a more culpable codefendant receives a life sentence, a sentence of death should not be imposed on the less culpable defendant. See, e.g., Hazen v. State, 700 So.2d 1207 (Fla.1997); Slater v. State, 316 So.2d 539 (Fla.1975).
The record in this case reflects the possibility that Hall was the shooter. Hall was injured during the shootout with Lindsey, and the placement of the wounds suggests that Hall was facing Lindsey with his arm raised in a shooting position. At a minimum, Ray and Hall are equally culpable. Both men actively participated in planning the robbery, in executing the robbery, and in stealing the car. During their escape from the robbery, they stopped to attend to a mechanical problem with the getaway vehicle, and a gun battle with Lindsey ensued. Forensic evidence shows gun residue on Ray's hands, injuries to *612 Hall from Lindsey's gun, and Hall's blood on the murder weapon. After Lindsey was killed, both men continued their flight until they were apprehended.
Much of the evidence points to Hall as the dominant player in the crimes. It is undisputed that Hall did nearly all the talking during the robbery and appeared to be in command of the operation. In addition, only Hall had shotgun injuries caused by the officer. Finally, Hall's statements and questions to paramedics suggest that he was responsible for shooting the officer. During sentencing the State argued that although Hall instigated the gun battle, both Hall and Ray shot Lindsey. The State sought the death penalty for both. The trial judge's own remarks in sentencing Hall reflect that, at a minimum, he believed Ray and Hall to be equally culpable in the shooting. It seems clear that the judge would have imposed equal sentences but for his belief that a failure to abide by the jury's recommendation would result in a reversal on appeal. Under these circumstances, the trial court's entry of disparate sentences was error. See Groover v. State, 703 So.2d 1035 (Fla.1997).
Without comparison to Hall's sentence, the imposition of the death penalty in this case is still disproportionate. The trial court found substantial nonstatutory mitigating factors. In contrast, it found three aggravating factors, two of which we combine based on an improper doubling. Furthermore, Ray's criminal history was scant. Under a proportionality analysis a death sentence is not appropriate in this case, as this is not one of the most aggravated and the least mitigated of first-degree murders. See Urbin v. State, 714 So.2d 411, 416 (Fla.1998).
The mitigating and aggravating evidence in this case is very similar to the evidence presented in Woods v. State, 733 So.2d 980 (Fla.1999). In Woods, the trial court found numerous mitigating factors and two aggravating factors, the contemporaneous conviction for attempted murder of the other victim, and cold, calculated and premeditated (CCP). This Court, however, found the evidence insufficient to support CCP. Of the mitigating factors, this Court was most persuaded by Woods' low I.Q. and by the fact that he had lived a life free of violent crimes until the offenses in that case. Woods, like Ray, was also an involved family man. "While the existence and number of aggravating or mitigating factors do not in themselves prohibit or require a finding that death is nonproportional, we nevertheless are required to weigh the nature and quality of those factors as compared with other similar reported death appeals." Kramer v. State, 619 So.2d 274, 277 (Fla.1993) (citation omitted). As in Woods, we find that the circumstances in the present case are insufficient to support the death penalty. We vacate the sentence of death and direct the trial court to enter a sentence of life imprisonment.
Ray's conviction for first-degree murder is hereby affirmed. We reverse the sentence of death and remand to the trial court for entry of an order sentencing Ray to life imprisonment.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, J., concurring in part and dissenting in part.
I concur as to the affirming of the conviction.
I dissent as to the reversal of the sentence and reduction to life imprisonment *613 based upon proportionality. I would apply this Court's decision in Burns v. State, 699 So.2d 646 (Fla.1997). The killing of a law enforcement officer is a very weighty aggravator.
NOTES
[1] Consequently, the robbery victims could not describe Ray and Hall except to say one was short and stocky, the other tall and thin.
[2] The six claims presented in this appeal: (1) the court erred in failing to instruct the jury on the independent acts doctrine; (2) the court erred in failing to admit Randall Whitney's testimony regarding Hall's criminal history; (3) the court erred in refusing to admit I.Q. evidence during the guilt phase of trial; (4) the court erred in imposing a sentence which was disproportionate to Hall's sentence; (5) the court improperly doubled an aggravating factor; and (6) the court's sentencing order constituted a violation in Spencer v. State, 615 So.2d 688 (Fla.1993).
[3] Although not evidence, the other "support" for the coercion theory came from statements by defense counsel during the trial.