945 So.2d 579 (2006)
Job CHARLES, Appellant,
v.
STATE of Florida, Appellee.
No. 4D04-4709.
District Court of Appeal of Florida, Fourth District.
December 13, 2006.
*580 Carey Haughwout, Public Defender, and Alan T. Lipson, Assistant Public Defender, West Palm Beach, for appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and James J. Carney, Assistant Attorney General, West Palm Beach, for appellee.
STEVENSON, C.J.
Job Charles was tried by jury and convicted of second degree murder, a lesser included offense of the charged first degree murder. Charles now appeals, arguing that the trial court's refusal to give his requested "independent acts" instruction and an erroneous evidentiary ruling compel reversal of his conviction. We find merit in these arguments and reverse.
Jean-Marcedly Lamarre was shot and killed on June 2, 2000. In prosecuting Charles for first degree murder, the State relied upon both premeditated and felony murder theories. In the weeks prior to Lamarre's death, Frantz Frederic made inquiries concerning Lamarre's whereabouts, testifying that he had loaned Lamarre $1500 and that Lamarre had promised to either repay him the money or give him cocaine. According to Frederic, Lamarre was a drug dealer. Frederic admitted that he found out Lamarre was staying with an ex-girlfriend, Melony Richard, and that he went to Richard's home on June 2, 2000, to get his money.
Frederic testified he could not simply go knock on the door because Richard would tell him Lamarre was not at home; the only way he was going to get his money was to rob Lamarre and he intended to enter the house and take whatever he found. On the morning of June 2, Frederic went to Charles's home, explained that Lamarre was "dodging" him and owed him money, that there was cocaine in the house, and that he wanted to go in and take whatever they found. According to Frederic, Charles agreed to help. After Charles indicated he did not want to enter the house alone, the pair recruited Kerlin Cherenfant. Frederic repeated the story to Cherenfant. Cherenfant got his gun and joined Frederic and Charles. Frederic testified the three agreed to split whatever they found in the house. The trio ultimately recruited a fourth man, Ulrich Leo. After Frederic re-told his story to Leo, Leo got his gun and joined them. The foursome drove to Richard's home.
Frederic testified he dropped Charles, Cherenfant, and Leo in the intersection and instructed them not to hurt anyone. Frederic was to drive around the block until they returned. While driving, Frederic heard a gunshot. He saw Lamarre run out of the house and fall in the street. Then, he saw Charles and Cherenfant running out and, seconds after that, he saw Leo. The foursome fled. According to Frederic, during their escape, Charles asked Cherenfant why he had shot Lamarre.
Frederic was eventually arrested for Lamarre's murder and, initially, named Dionny Desir, who had been killed two weeks after the incident, as the trigger man. Frederic later recanted this story, identifying Charles, Cherenfant, and Leo as the perpetrators. After Frederic identified Charles, police compared Charles's prints to those found on a battery that was embedded with glass and appeared to have been used to shatter a glass door at the rear of the home to gain entry. The prints matched and Charles was arrested.
Charles gave a taped statement to police, insisting there was no plan to commit a "robbery." Despite this, Charles admitted Frederic told them Lamarre "pushed kilos" and they should pick up whatever they found in the house. He also told *581 police he owed Frederic $50 and that, if he helped, Frederic had agreed to wipe out the debt, plus he would get a share of any money found. According to Charles, Frederic had come to him looking for a gun. Charles did not have one and suggested Frederic talk to Leo. Charles accompanied Frederic to Leo's home. Leo got his gun and Frederic again explained that Lamarre owed him money and was avoiding him. In Charles's version of events, the trio recruited Cherenfant because Charles did not want Leo to enter the home alone. In his taped statement, Charles insisted Leo and Cherenfant were "plotting [a] scheme" and they involved him because they needed a lookout.
In the taped statement, Charles told police the plan was to "beat up" Lamarre and to scare him. Charles went to the north side of the house, heard the voice of a man and a woman, and reported this to Cherenfant and Leo, who instructed Charles to break the glass door. In the taped statement, Charles admitted he picked up a nearby car battery and threw it through the door. Charles told police he ran to the front of the house, while Leo and Cherenfant went inside. Charles did not see Frederic. When he turned to go back to the house to tell Leo and Cherenfant that Frederic had abandoned them, he heard a gun shot. Charles changed course and headed back to the street. This time, Frederic was there. Charles got in the car and, when Frederic indicated he was leaving, Charles told him not to because they did not know what had happened. Charles then saw Lamarre run into the street and collapse. Cherenfant and Leo were not far behind and both men jumped in the car. Charles told police that, according to Leo, Cherenfant had fired the shot.
By the time of trial, Charles's version of events had changed. Now, according to Charles, the plan had been only to "scare" Lamarre into repaying the debt he owed Frederic. And, in this version, Charles had not used the car battery to break the glass door. Rather, Charles testified he had simply pushed it up to the house and stood on it so he could get a better look inside. Charles told the jury that, when he heard two voices in the house, he told Leo and Cherenfant he did not think it was a good time to confront Lamarre and began heading back towards the front of the house and the street; it was then that he heard a crash, presumably the glass breaking. Charles did not initially see Frederic and turned back toward the house to tell the others. Then, he heard a shot. At trial, Charles testified the shot "surprised" him because Frederic had told Cherenfant and Leo not to load the guns and, prior to hearing the shot, he did not know the guns were loaded. Charles insisted he received no benefit from the plan to scare Lamarre and denied he owed Frederic money.
Richard identified Leo as the man she saw going out the bedroom window of her home. Other than the prints on the battery, there was no physical evidence placing Charles at or in the home.

The Independent Acts Instruction
The State conceded Charles was not the man who pulled the trigger. Nonetheless, the State argued Charles was guilty of first degree murder, relying upon the law of felony murder and principals. The statutory definition of first degree murder includes "[t]he unlawful killing of a human being . . . [w]hen committed by a person engaged in the perpetration of, or in the attempt to perpetrate" certain enumerated felonies, including burglary and robbery. § 782.04(1)(a)2.d., e., Fla. Stat. (2000). Under the law of principals, a defendant will be treated as if he did all the acts performed by the others involved *582 in the perpetration of a crime if (1) the defendant "ha[d] a conscious intent that the crime be done" and (2) the defendant "d[id] some act or sa[id] some word which was intended to and d[id] incite, cause, encourage, assist, or advise another person to actually commit the crime." R.J.K. v. State, 928 So.2d 499, 503 (Fla. 2d DCA 2006); see also Bryant v. State, 412 So.2d 347, 350 (Fla.1982) ("[T]he felony murder rule and the law of principles [sic] combine to make a felon liable for the acts of his co-felons.").
In support of its law of principals and felony murder rule theories, the State relied upon evidence that (1) Charles took Frederic to Leo to help him find a gun and (2) once at the victim's home, Charles looked in the windows to determine how many people were inside, relayed this information to Cherenfant and Leo, both of whom had guns, used a car battery to shatter the glass door, returned to warn Leo and Cherenfant that Frederic had left, and, finally, after hearing the shot, convinced Frederic not to abandon Leo and Cherenfant. Charles, though, testified that the only plan was to knock on the door and use the guns to scare Lamarre into paying the debt and that, as a consequence of Frederic's instructions, he believed the guns were not loaded. Charles testified that after he realized two people were home, he told the others he did not think it was a good time and walked away from the house. Charles denied he used the battery to break the door and testified he had walked away by the time he heard the glass break and the subsequent shot. In light of this evidence, Charles argued the forced entry into the home and the subsequent shooting constituted "independent acts" on the part of Leo and Cherenfant and asked that the jury be read the standard independent acts instruction.
The instruction informs the jury that the defendant should be found not guilty if the alleged crime was the independent act of another:
An independent act occurs when a person other than the defendant commits or attempts to commit a crime
1. which the defendant did not intend to occur, and
2. in which the defendant did not participate, and
3. which was outside of and not a reasonably foreseeable consequence of the common design or unlawful act contemplated by the defendant.
Fla. Std. Jury Instr. (Crim.) 3.6(L). The trial court refused to give the instruction. The decision to give a requested jury instruction is generally reviewed for an abuse of discretion. See, e.g., Davis v. State, 922 So.2d 438, 444 (Fla. 5th DCA 2006). In criminal cases, "the trial court's discretion . . . is rather narrow because a criminal defendant is entitled to have the jury instructed on his or her theory of defense, if there is any evidence to support this theory," see id., "no matter how weak or flimsy," see Gregory v. State, 937 So.2d 180, 182 (Fla. 4th DCA 2006). "The trial court should not weigh the evidence for the purpose of determining whether the instruction is appropriate." Id.
For a defendant to be criminally liable for the acts of his co-felons as a consequence of the felony murder rule and the law of principals, it is necessary that "the lethal act . . . be in furtherance or prosecution of the common design or unlawful act the parties set out to accomplish"; "there must be some causal connection between the homicide and the felony." Bryant, 412 So.2d at 350. The lethal act will be in furtherance of or causally connected to the original scheme where it assists in escape or the avoidance of "immediate detection," see Lovette *583 v. State, 636 So.2d 1304, 1307 (Fla. 1994), or "[w]here . . . the defendant was a willing participant in the underlying felony and the murder resulted from forces which they set in motion," see Ray v. State, 755 So.2d 604, 609 (Fla. 2000). A defendant will not, however, be held criminally liable for acts of his co-felons in which he did not participate and "`which fall outside of, and are foreign to, the common design of the original collaboration.'" Thomas v. State, 787 So.2d 27, 29 (Fla. 2d DCA 2001) (quoting Ray, 755 So.2d at 609) (other citations omitted).
In Thomas, three men, Thomas, Rodriguez, and Miller, agreed to rob the night manager of the store where Thomas worked. There was evidence that the plan was for Rodriguez and Miller to wait in the bushes, ambush the manager when she came out, demand the night's cash receipts, spray her with mace, and run to a nearby alley where Thomas would be waiting with a getaway car. Rodriguez insisted the plan always called for the use of a gun. Thomas denied this. According to Thomas, when he and Miller discovered Rodriguez had a gun, they drove to his hiding spot and gave the signal for him to abandon the robbery. Thomas stated that Rodriguez failed to appear and that it was only after he and Miller drove to a nearby store that they heard gunshots. Rodriguez had shot and killed the manager. The Second District held that since the evidence could have permitted the jury to conclude that Rodriguez's shooting of the manager was an independent act and not in furtherance of the original plan, the trial court had reversibly erred in failing to give an independent act instruction. See 787 So.2d at 30.
The facts in this case are sufficiently analogous to those in Thomas to compel the same conclusion here. In Thomas, the defendant testified that the plan was to rob the manager using non-lethal force, i.e., there would be no guns, and that, when it became clear that one of his co-felons intended to use a gun, he took measures to abandon the criminal scheme. Similarly, in this case, Charles testified that the plan was only to scare Lamarre and that Frederic had instructed that the guns not be loaded. According to Charles, when he realized that people other than Lamarre were present in the home, he abandoned the plan, leaving Cherenfant and Leo at the residence. Thus, as in Thomas, we hold that the trial court erred in failing to give the requested jury instruction.
The cases cited by the State, Washington v. State, 873 So.2d 1268 (Fla. 4th DCA 2004), Jones v. State, 804 So.2d 551 (Fla. 3d DCA 2002), and Diaz v. State, 600 So.2d 529 (Fla. 3d DCA 1992), are distinguishable. In all of these cases, the defendant admitted to planning and being a participant in a robbery that resulted in a shooting. Here, if Charles's trial testimony was to be believed, there was never any plan to rob the victim; rather, Charles agreed only to participate in an aggravated assault, i.e., the scaring of Lamarre with unloaded guns. Finally, we reject the State's claims that the error does not compel reversal because the instructions that were given the jury adequately addressed the legal issues and because Charles's trial testimony was not credible. We, therefore, reverse Charles's conviction and remand for a new trial.
Because the case is to be retried, we address the evidentiary issue raised by Charles. The State relied upon the law of principals in arguing that Charles was guilty of Lamarre's murder. To that end, the jury was instructed Charles was a principal and responsible for the actions of the others involved in the perpetration of the crime if "one, the defendant had a *584 conscious intent that the criminal act be done; and two, the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist or advise the other person or persons to actually commit the crime." Over defense counsel's objection, the prosecutor was permitted to ask Detective Nicholson, the lead investigator, (1) whether there was evidence Charles assisted the two men who entered the residence and to identify such evidence and (2) whether there was evidence Charles was to benefit from this assistance and to identify such evidence. Such questioning was improper as it tended to elicit an opinion from the officer as to whether the evidence was such that the defendant met the definition of a "principal." See Thomas v. State, 837 So.2d 443, 446 (Fla. 4th DCA 2002) (recognizing that "a witness's opinion as to the guilt or innocence of the accused is not admissible" and holding that, in a case where defendant was charged with and convicted of second degree murder and leaving the scene of an accident for deliberately running into victim with a van, it was error to ask police officer whether he was convinced defendant was driver of van).
Reversed and Remanded.
WARNER and TAYLOR, JJ., concur.