CIKLIN, J.
Luis Garcia appeals his conviction for first-degree murder and life sentence. Garcia contends that the trial court erred in denying his motion to suppress evidence and in refusing to instruct the jury on the defense of independent act. We agree, reverse his conviction, and remand for a new trial.

Background

On January 4, 2008, the body of Jerome Jones was found lying face up in the roadway about 100 feet from the parking area of a rest stop on Alligator Alley. Jones had been shot in the back of his head. There was the smell of urine where Jones had been standing along the curb and his zipper was opened. A Parliament brand cigarette was located about two and a half feet from Jones’s foot.
Detective Efrain Torres of the Broward Sheriffs Office (BSO) was dispatched to the crime scene and assigned to be the lead homicide investigator. After the victim had been identified, Detective Torres was able to locate Marcello Isaac, Jones’s half brother. After several hours of questioning, Isaac told Detective Torres that Jones had come to Florida to conduct a drug deal with Garcia. According to Isaac, Jones had shown Isaac a duffle bag filled with cash and told him that the bag contained $102,000 with which Jones was going to purchase “six kilos.” Isaac also informed Detective Torres that the last time he saw Jones alive was when he dropped Jones off at Garcia’s house around 3:00 p.m. on the day Jones was killed.
Based on Isaac’s statements, Detective Torres decided to question Garcia. Isaac showed the detective where Garcia lived and where Garcia’s girlfriend lived, but Garcia was not at either of the residences when the police arrived. Detective Torres had also obtained Garcia’s cell phone number from Isaac and used that number to track the present location of Garcia’s cell phone. On January 6, 2008, Detective Torres contacted the Pembroke Pines Police Department and asked them for assistance in locating Garcia. He advised them that Garcia was a possible murder suspect and gave a description of the van Garcia was likely driving and Garcia’s approximate location.
Officer Nicholas Taber, a police officer for the City of Pembroke Pines, was able to locate a van matching the description that Detective Torres had provided driving in the area specified. The officer stopped *398 the van which was in fact being driven by Garcia at around 6:40 p.m. With their guns drawn and pointed toward the van, Officer Taber and another officer ordered Garcia to exit the van, handcuffed him, patted him down, and then put him in the back of Officer Taber’s locked patrol car.
A few minutes later, Detective Torres arrived. He took Garcia out of Officer Taber’s car and asked Officer Taber to remove the handcuffs. Detective Torres informed Garcia that he wanted to speak to him about Jones and asked Garcia to come with him to the BSO public safety building. According to Detective Torres, Garcia agreed to this request.
Detective Torres asked Officer Taber to transport Garcia in the back of the officer’s patrol car because it contained a cage. Garcia was not handcuffed as he was transported to the public safety building. On the way, they stopped by a garage in Miramar where Garcia had told Detective Torres his BMW was being repaired. When they arrived at the garage, Detective Torres got out of the car, but was unable to verify if Garcia’s vehicle was there because the shop and bay doors were closed. Garcia did not get out of the patrol car and was never offered the opportunity to do so. From there, they all continued to BSO headquarters.
A video recording of the incident shows a handcuffed Garcia being led into an interview room at approximately 8:00 p.m., Detective Torres removing handcuffs from Garcia, and then the detective leaving Garcia alone in the interview room for approximately forty minutes. The door to the room was locked while Garcia waited inside for Detective Torres to return. At approximately 8:40 p.m., Detective Torres returned and advised Garcia of his Miranda rights. Garcia signed a form acknowledging that he was waiving his rights and agreeing to speak with the detective. Garcia also signed consent forms allowing the police to search his residence, two vehicles, and phone records.
In response to Detective Torres’s questioning that evening, Garcia claimed that he had arranged for Jones to purchase a large quantity of cocaine from someone named Gordo. Garcia asserted that he was paid $3000 for arranging this deal. The deal was to occur at a house in Weston, to which Garcia agreed to take Jones in Garcia’s BMW. On the way, Garcia had car trouble, so he pulled into a gas station while Jones was on the phone to find someone else to take him. Jones asked Garcia to take him back to Isaac’s residence, which Garcia did. Once there, Jones got into a gray Lexus with two men and a woman and left. Garcia stated that he did not drive to Alligator Alley on January 4th and that, at 8:30 p.m., he was at home with his son.
The interview continued until the early morning hours of January 7th. At the conclusion of the interview, Detective Torres and another law enforcement officer drove Garcia home in a regular undercover car without a cage.
On January 9th, Detective Torres called Garcia and asked him to come to the station again. Garcia agreed to do so and returned there on his own. Detective Torres again read the Miranda warnings to Garcia and Garcia again signed a written waiver. Garcia also consented to a DNA sample at that time.
During this second interview, Detective Torres told Garcia that he knew Garcia had lied to him in his previous interview because phone records showed that Garcia’s phone had been used on Alligator Alley the night of the murder. Garcia changed his story, asserting instead that he had actually taken Jones to Naples and that he had lied about not being on Alliga *399 tor Alley. The original plan had been to go to Weston, but on the way, Jones got a call from Gordo who wanted the deal to be in Naples instead. Garcia said that on the way to Naples, he saw that Jones had a gun. Upon seeing the gun, Garcia immediately exited the highway and told Jones to get out of the car. Garcia said that he left Alligator Alley as soon as he dropped off Jones.
Later in the interview, Garcia changed his story again. This time, Garcia claimed that he had tried to set up a deal for Jones, but that the deal never occurred. Instead, Jones arranged his own deal with people who were unknown to Garcia. Garcia agreed to drive Jones to the deal and was supposed to be paid $3000 for doing so. Jones instructed Garcia to drive them to the recreation area on Alligator Alley where law enforcement later found Jones dead. When Jones and Garcia arrived, a tractor trailer with one man and a gray Lexus with two other men were already there. Jones got out of the car with the bag. Garcia stood outside three to five minutes and saw Jones cut open a bag of cocaine with a small knife. He saw the men complete the transaction with Jones taking the cocaine. Garcia claimed that he then witnessed one of the men shoot Jones in the back of the head, take the bag of cocaine from Jones, and then exclaim that Jones had given them “fake money.”
At the conclusion of this interview, Officer Torres placed Garcia under arrest. At the time that Garcia was arrested, he had a Parliament brand cigarette, the same brand of cigarette which was found at the crime scene, and $2700 in cash on his person.
Prior to trial, Garcia’s defense counsel filed a motion to suppress evidence alleging that Garcia’s detention on January 6, 2008 was unlawful. At the suppression hearing, Detective Torres and Officer Ta-ber testified to the aforementioned facts regarding their investigation and interaction with Garcia. Additionally, Detective Torres testified during cross-examination that although Garcia was never under arrest on January 6, 2008, the detective did not remember if at any point he or anyone else told Garcia that he was free to leave.
The trial court denied Garcia’s motion to suppress and found that Detective Torres had “sufficient articulable facts to support his reasonable suspicion of possible criminal behavior justifying the investigatory stop” of Garcia. The court further found that Officer Taber, “in the interest of officer safety, reasonably frisked and handcuffed a person reported to be a murder suspect.” According to the trial court, “this brief handcuffing” was a temporary detention and not an arrest. The court also found that Garcia had “freely and voluntarily consented to the search of his residence, two vehicles and his telephone.”
At trial, in addition to the testimony of several witnesses including Detective Torres and Isaac, the state introduced cell phone records from which the jury could infer that Garcia was on Alligator Alley making phone calls from 5:32 p.m. to 7:08 p.m. on the night of the murder. The state also introduced DNA evidence showing that Garcia’s DNA was on the cigarette butt found at the scene of the crime. Additionally, the state introduced and played for the jury the recorded interviews that the police conducted of Garcia on January 6, 2008 and January 9, 2008.
At the charge conference, defense counsel argued that the standard jury instruction on independent act[1] should be given in this case because it was the theory of defense. Defense counsel argued that the *400 defense theory was that Garcia did not know that Jones’s money was counterfeit, did not know who the sellers were or what they were going to do, and only gave Jones a ride. The trial court declined to give the instruction because “in a drug traffic[king offense], violence and murder is always a foreseeable consequence.”
The jury found Garcia guilty of first-degree murder, as charged in the indictment. On the second page of the verdict form, however, the jury found that Garcia did not actually possess a firearm and that Garcia was not the one that actually fired the gun that killed Jones. The trial court then adjudicated Garcia guilty of first-degree murder and sentenced him to life in prison.

Motion to Suppress

On appeal, Garcia argues that the trial court erred in denying his motion to suppress evidence. Garcia claims that the police lacked reasonable suspicion to stop him initially. Garcia further argues that even if police had reasonable suspicion, his detention on January 6th was unlawful because the encounter became a de facto arrest without probable cause when Garcia was transported to the public safety building for questioning. “When reviewing a trial court’s decision on a motion to suppress, an appellate court must defer to the trial court’s factual findings but review legal conclusions de novo.” Gray v. State, 981 So.2d 562, 564 (Fla. 4th DCA 2008) (citation and quotation marks omitted).
In Popple v. State, 626 So.2d 185, 186 (Fla.1993), the Florida Supreme Court explained that “[t]here are essentially three levels of police-citizen encounters.” The first level is “a consensual encounter [which] involves only minimal police contact;” the second level is “an investigatory stop as enunciated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968);” and the third level is “an arrest which must be supported by probable cause that a crime has been or is being committed.” Popple, 626 So.2d at 186.
The trial court concluded, and we agree, that the initial detention of Garcia on January 6, 2008 was an investigatory stop. “During an investigatory stop, a police officer may reasonably detain a citizen temporarily if the officer has a reasonable suspicion that a person has committed, is committing, or is about to commit a crime. The officer’s reasonable suspicion must be well-founded and articulable.” Gray, 981 So.2d at 564-65 (citation and quotation marks omitted). “Mere suspicion is not enough to support a stop.” Popple, 626 So.2d at 186. “Whether an officer’s suspicion is reasonable is determined by the totality of the circumstances which existed at the time of the stop and is based solely on facts known to the officer before the stop.” Fuentes v. State, 24 So.3d 1231, 1234 (Fla. 4th DCA 2009) (emphasis added). The totality of circumstances, however, should be interpreted in the light of the officer’s knowledge and experience. See May v. State, 77 So.3d 831, 834 (Fla. 4th DCA 2012).
At the time Detective Torres requested assistance from the Pembroke Pines Police Department in stopping Garcia, Jones’s half brother, Isaac, had informed Detective Torres that he had last seen Jones when he left him at Garcia’s house at 3:00 p.m. on the day of the murder, and that Garcia and Jones were going to conduct a drug transaction involving multiple kilos of cocaine and more than $100,000 in cash. At that point in time, however, Detective Torres had not yet examined Garcia’s historical cell site information and determined that Garcia was on Alligator Alley making phone calls on the evening of the murder.
Detective Torres acknowledged that at the time he questioned Isaac, Isaac was *401 also a suspect and that it took several hours of questioning before Isaac told the detective about the intended drug transaction. Nevertheless, Detective Torres was the one who actually questioned Isaac and was in the best position to determine the veracity of Isaac’s statements. See May, 77 So.3d at 835 (“[I]n determining whether an officer has a reasonable suspicion to conduct an investigatory stop, some deference should be given to the officer’s perspective and the officer’s training and experience.”).
Whether Detective Torres had reasonable suspicion to justify the traffic stop of Garcia on January 6, 2008 is questionable. Nevertheless, when we interpret the evidence in a light most favorable to sustaining the trial court’s ruling, we find that Detective Torres had reasonable suspicion to justify the initial investigatory stop of Garcia to question him or investigate his role in Jones’s death. See Kelly v. State, 77 So.3d 818, 821 (Fla. 4th DCA 2012) (“The trial court’s ruling on a motion to suppress comes to the appellate court with a presumption of correctness, and the court must interpret the evidence, inferences and deductions therefrom in favor of sustaining the trial court’s ruling.”).
Our analysis does not end here, however, because Garcia’s encounter with law enforcement on January 6, 2008 extended far beyond the initial investigatory stop when Garcia was transported back to the BSO public safety building for questioning. Garcia argues that even if the initial detention was proper, the temporary detention at the side of the road was converted into a de facto arrest without probable cause when the police brought him to the police station for further questioning. The state does not argue that transporting Garcia back to the public safety building was part of the investigatory stop nor does it challenge Garcia’s claim that the police lacked probable cause to arrest him on January 6, 2008. Rather, the state contends that Garcia’s interrogation at the police station was a consensual encounter.
“When determining whether a particular encounter is consensual, the Court must look to the totality of the circumstances surrounding the encounter to decide if the police conduct would have communicated to a reasonable person that the person was free to leave or terminate the encounter.” Taylor v. State, 855 So.2d 1, 15 (Fla.2003) (citation and quotation marks omitted). Factors to consider in determining whether a reasonable person would consider himself to be in custody under the totality of circumstances include:
(1) the manner in which police summon the suspect for questioning; (2) the purpose, place, and manner of the interrogation; (3) the extent to which the suspect is confronted with evidence of his or her guilt; (4) whether the suspect is informed that he or she is free to leave the place of questioning.
Caldwell v. State, 41 So.3d 188, 198 (Fla.2010).
Considering the above factors, we conclude that a reasonable person in Garcia’s position would not have felt free to terminate the encounter with the police after the police had completed their investigatory stop on January 6, 2008.
First, the manner in which the police summoned Garcia for questioning would suggest to a reasonable person that he or she was not free to leave or terminate the encounter. Garcia was stopped while driving legally on a public road. The officers that pulled Garcia over approached his car with their guns drawn and pointed toward him. They ordered Garcia to exit the van, handcuffed him, patted him down, and then put him in the back of a locked patrol car. Although Detective Torres had Gar- *402 eia removed from the patrol car and his handcuffs removed before asking Garcia to come to the public safety building with the officers, a reasonable person in Garcia’s position would likely interpret the previous show of authority as an indication that he had no choice but to comply with Detective Torres’s request.
Additionally, Garcia was never informed that he was not under arrest and that he was free to leave the place of questioning. During cross-examination of Detective Torres at the motion to suppress hearing, defense counsel asked the detective if “[a]nybody ever [told] [Garcia] he was free to leave?” The detective responded, “I don’t remember if I did or not.” Likewise, Officer Taber testified that he never told Garcia that Garcia was free to leave.
Even if Garcia’s initial agreement to return to the public safety building with Detective Torres constituted valid consent, the otherwise consensual encounter matured into a seizure at some point before Garcia’s interrogation began. Garcia was required to abandon his girlfriend’s van on the side of the road and ride to the public safety building in the back of a police car containing a cage between the front and back seat. On the way to the public safety building, the officers and Garcia stopped by a garage where Garcia had said his BMW was being repaired. At the garage, Garcia did not get out of the patrol car and was never offered the opportunity to do so. Cf Schoenwetter v. State, 931 So.2d 857, 867 (Fla.2006) (finding that the defendant was not under de facto arrest where the defendant “voluntarily agreed to accompany the officers to the station when asked, rode in the back of the police car without handcuffs, and exited the car when officers stopped for a snack” (emphasis added)).
At the public safety building, Garcia was led into an interview room in handcuffs. The handcuffs were removed, but Garcia was then left alone in the locked interview room for approximately forty minutes. At that point, Detective Torres returned and read Garcia his Miranda rights. Detective Torres did not, however, tell Garcia that he was not under arrest or that he could leave at any time. In Caldwell, the Florida Supreme Court rejected this court’s conclusion that as a matter of law, an otherwise consensual encounter matures into a seizure when an officer administers Miranda warnings. 41 So.3d at 199-200. Nevertheless, the supreme court recognized that the reading of Miranda warnings is a factor to consider in the totality of circumstances analysis as to whether a consensual encounter matured into a seizure. Id. at 202. Under the circumstances of this case, the police conduct of reading the Miranda warnings after having locked the citizen in an interview room for forty minutes would communicate to a reasonable person that he or she was no longer free to leave regardless of the previous nature of the police encounter.
Thus, based on the totality of these circumstances, we conclude that a reasonable person in Garcia’s position would not have felt that he or she “was free to leave or terminate the encounter.” See Taylor, 855 So.2d at 15. Our decision should not be construed to mean that law enforcement cannot bring consenting citizens to police stations for questions. Nor do we suggest that absent probable cause, it is improper for the police to handcuff potential suspects as they are led through the police station or to place them in locked interview rooms while the officers prepare for questioning. We defer to law enforcement with regard to how to best ensure the safety of officers and other personnel at police stations. Where law enforcement feels the need to use such safety precautions, however, it becomes extremely im *403 portant that the police clearly explain to the citizen being questioned that he or she is not under arrest and is free to leave at any time.
Having determined that Garcia’s encounter with the police on January 6, 2008 was converted into a de facto arrest without probable cause, we must also determine whether the statements that Garcia made to the police were inadmissible at trial as a result of that illegal arrest. In Adams v. State, 830 So.2d 911 (Fla. 3d DCA 2002), the Third District explained:
In general, a confession obtained during custodial interrogation after an illegal arrest is inadmissible at trial. However, such a confession is admissible as evidence where the State can prove the causal chain between the arrest and the confession is broken. See Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Roman v. State, 475 So.2d 1228 (Fla.1985).
There are numerous factors which a court must analyze to determine whether a suspect confession is free of the taint of an illegal arrest. The most important factors are: “the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagraney of the official misconduct.” Brown v. Illinois, 422 U.S. at 603, 95 S.Ct. 2254. The taint of an illegal confession cannot be purged solely by the act of reading a defendant his Miranda rights. See Taylor v. Alabama, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Ames v. State, 739 So.2d 699 (Fla. 1st DCA 1999).
Id. at 914.
Applying these factors to this case, the statements that Garcia made to the police on January 6, 2008 should have been inadmissible at trial. The statements that Garcia made on January 9, 2008, however, were free of the taint of the illegal arrest. Two full days passed between the de facto arrest and Garcia’s return to the police station on January 9, 2008. Importantly, Garcia drove himself back to the public safety building on this second visit. Additionally, there was no evidence that the de facto arrest was the result of purposeful or flagrant misconduct by the police.
The trial court’s error in admitting Garcia’s January 6th recorded statements into evidence was not harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129 (Fla.1986). During closing arguments, the prosecutor emphasized the fact that Garcia denied for “hours and hours” that he was present at the crime scene. The state also suggested that none of Garcia’s versions of the events were entirely truthful and that his evolving stories over the two days of interrogation proved Garcia was hiding his direct involvement in the murder. Given the inconsistencies in the statements and the prosecutor’s usage of these inconsistencies during closing arguments, we cannot state beyond a reasonable doubt that the impermissible admission of Garcia’s January 6th statements did not affect the jury’s verdict.
Having found that the trial court committed reversible error in denying Garcia’s motion to suppress in its entirety, we are compelled to reverse Garcia’s conviction and remand for a new trial. Garcia’s January 6, 2008 statements should be suppressed and are therefore inadmissible at the new trial. The trial court should also redact any portions of the January 9, 2008 statements which refer to the earlier statements. The trial court will also need to determine if any other physical evidence *404 was tainted by the unreasonable de facto arrest of Garcia on January 6, 2008.

Independent Act Jury Instruction

Just prior to closing arguments, defense counsel claimed that the theory of defense was that Jones’s murder was an “independent act” and requested the trial court to give the standard jury instruction for that defense. The trial court denied this request noting that “violence and murder is always a foreseeable consequence” in drug trafficking offenses. Garcia argues that this was reversible error. We agree.
“An independent act occurs when a co-felon commits or attempts to commit a crime that was not part of the common plan and that the defendant did not intend to occur, and in which the defendant did not participate, and those acts are outside of and not a reasonably foreseeable consequence of the common design or unlawful acts contemplated by the defendant.” Johnson v. State, 36 So.3d 170, 171 (Fla. 3d DCA 2010). Such a defense, however, cannot apply when death was a natural and foreseeable result of the plan. See Archer v. State, 613 So.2d 446, 448 (Fla.1993) (holding that the independent act theory is inappropriate when the defendant created the situation and the victim’s death was a natural and foreseeable result of forces which the defendant set in motion). For this reason, we have consistently held that the independent act instruction is not appropriate when a co-felon murders someone during the commission of an armed robbery. See, e.g., Washington v. State, 873 So.2d 1268, 1270 (Fla. 4th DCA 2004) (“A shooting that occurs during an armed robbery with a firearm does not exceed the scope of the armed robbery so that an independent act instruction is required.”).
We have never held, however, that any felony which the legislature has enumerated as an underlying felony for felony murder indicates that “murder is always a foreseeable consequence” of that felony. For example, in Charles v. State, 945 So.2d 579 (Fla. 4th DCA 2006), we determined that a trial court had committed reversible error in refusing to give the independent act instruction in a felony murder case where one of the underlying felonies was burglary. Id. at 581-82. The defendant in Charles testified that the “plan” was to go to the victim’s house and scare him into repaying a debt. His co-felons were supposed to do this using unloaded guns. One of his co-felons, acting independently of the plan, used a loaded weapon and shot the victim. We found that based on the defendant’s testimony, a jury could find that the co-felon’s actions were “outside of, and ... foreign to, the common design of the original collaboration.” Id. at 583. In reaching our conclusion as to why the shooting was not foreseeable, we noted that if the defendant’s trial testimony was to be believed, “there was never any plan to rob the victim.” Id.
Here, Garcia’s statement to police — or at least his last version of the incident — was that he had agreed to drive Jones to a drug transaction that Jones himself arranged. Garcia understood that Jones’s intention was to purchase multiple kilos of cocaine for more than $100,000 in cash. Garcia claimed, however, that he did not even know who the sellers in the transaction were. Garcia heard one of the sellers shout that Jones’s money was fake and then witnessed the man shoot Jones in the head. Based on Garcia’s statements to law enforcement, a jury could find that Jones’s murder was outside of and not a reasonably foreseeable consequence of the drug transaction contemplated by Garcia.
Furthermore, the error in failing to give the independent act instruction was not harmless. Contrary to the state’s con *405 tention that “there was absolutely no evidence of another shooter,” the jury found that while Garcia was guilty of first-degree murder, Garcia did not “actually possess a firearm,” did not “actually discharge a firearm,” and did not “actually inflict death to [Jones] as a result of discharging a firearm in his possession.”

Conclusion

We find that the trial court committed reversible error in admitting Garcia’s January 6, 2008 statements to law enforcement and in denying defense counsel’s request to have the jury instructed on the independent act defense. Accordingly, we reverse Garcia’s conviction and remand for a new trial. At the new trial, the trial court should suppress Garcia’s January 6th statements, redact portions from the January 9th statements which refer to the earlier statements, and instruct the jury on the independent act defense if the state presents Garcia’s January 9th statements as evidence at the new trial.

Reversed and remanded for a new trial.

GERBER and LEVINE, JJ., concur.

. Defense counsel was referring to Florida Standard Criminal Jury Instruction 3.6{l).